## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ZURY BRITO-ARROYO,
BONIFACIO BRITO-MALDONADO,
and ROBERTO ARROYO-GARCIA

CRIMINAL CASE NO.

1:17-cr-00337-TWT-RGV

## <u>MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER</u>

Defendants Zury Brito-Arroyo ("Brito-Arroyo"), Bonifacio Brito-Maldonado ("Brito-Maldonado"), and Roberto Arroyo-Garcia ("Arroyo-Garcia"), collectively referred to as "defendants," are charged with manufacturing and possessing with intent to distribute methamphetamine, conspiring to do so, and maintaining a place to manufacture methamphetamine, wherein a minor child resides, and near an elementary school. [Doc. 27].[1] Brito-Arroyo and Brito-Maldonado are also charged with being illegal aliens in possession of firearms, and Arroyo-Garcia is charged with illegally reentering the United States, after previously having been deported. [Id.]. Arroyo-Garcia has filed a motion and an amended motion to dismiss or alternatively to sever Count 7, [Docs. 59 & 83], Brito-Maldonado and Brito-Arroyo

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

have filed motions to suppress, [Docs. 64, 77, & 114], and Brito-Arroyo has filed a

motion for disclosure of confidential informants, [Doc. 117].  Following evidentiary

hearings on April 26, 2018, April 30, 2018, September 25, 2018, and October 2, 2018,[2]

on the pending motions to suppress, the parties filed post-hearing briefs, [Docs. 130,

133, 138, & 139].  For the reasons that follow, Brito-Arroyo's motion for disclosure

of confidential informants, [Doc. 117], is **DENIED**, and it is **RECOMMENDED** that

Arroyo-Garcia's motions to dismiss or alternatively to sever, [Docs. 59 & 83], Brito-

Maldonado's motion to suppress evidence obtained from the search of his residence,

[Doc. 64], and Brito-Arroyo's motions to suppress evidence from the tracker device

and from other searches, [Docs. 77 & 114], be **DENIED**.

## I.  FACTUAL BACKGROUND

During the summer of 2017, Special Agent Steven Ledgerwood ("SA

Ledgerwood") of Homeland Security Investigations ("HSI") received information

from a confidential informant ("CI") that the driver of "a blue Jeep Grand Cherokee

---

[2] See [Doc. 110] for a transcript of the April 26 and 30, 2018, evidentiary hearings, [Doc. 124] for a transcript of the September 25, 2018, evidentiary hearing, and [Doc. 125] for a transcript of the October 2, 2018, evidentiary hearing.  Citations to the April 2018 evidentiary hearings transcript hereinafter will be referred to as "(Tr. 1 at ___)," citations to the September 25, 2018, evidentiary hearing will be referred to as "(Tr. 2 at ___)," and citations to the October 2, 2018, evidentiary hearing will be referred to as "(Tr. 3 at ___)."  In addition, the parties submitted exhibits at the evidentiary hearings, which will be referred to as "(Gov't Ex. ___)" for the government's exhibits and ("Def. Ex. ___") for defendants' exhibits.

with a Georgia tag . . . HU90EW" (the "Jeep") had conducted "an exchange of narcotics" at a "well known location where drugs are distributed here in Atlanta." (Tr. 2 at 8-10).[3]  The CI further stated that he saw the drugs and believed they were "methamphetamine."  (Tr. 2 at 10).  SA Ledgerwood also subsequently learned that the Sandy Springs Police Department was investigating the same Jeep for "money laundering activities."  (Tr. 2 at 13).  Agents were able to locate the Jeep parked at the Mosaic Apartment complex in Sandy Springs and attempted to conduct surveillance of it without success because there were days when the Jeep did not move, and on one occasion when it did move, agents "lost the vehicle almost immediately in that traffic around 285 and Roswell Road."  (Tr. 2 at 11).  SA Ledgerwood decided to seek a tracker warrant for the Jeep.  (Tr. 2 at 11-12).

SA Ledgerwood sent a text message to HSI Task Force Officer ("TFO") Eric Angel ("TFO Angel"), who also serves as a Deputy Sheriff with the Coweta County Sheriff's Office, asking, "[C]an you hook us up with tracker order HU90EW blue Jeep Grand Cherokee?  We can try your new tracker out.  Vehicle is moving currency and narcotics per reliable CI."  (Tr. 2 at 13-14, 23; Tr. 2, Gov't Ex. 1).  SA Ledgerwood selected TFO Angel from among approximately twelve task force

---

[3] The following is a summary of the testimony and evidence presented at the evidentiary hearings, and additional details will be included in the discussion of the specific pending motions.

officers to obtain the warrant based on SA Ledgerwood's understanding that a deputy has "statewide authority" and because TFO Angel would obtain the warrant from a superior court judge, rather than a magistrate, which SA Ledgerwood believed to be "better courts to go through." (Tr. 2 at 22-25, 47). Additionally, SA Ledgerwood believed that "superior court judge[s]" had "statewide authority" to issue warrants, (Tr. 2 at 41, 43), which he understood to mean that "a superior court judge in Coweta County could issue a tracker warrant for a car that's located in Fulton County," or as far away as "Savannah, Georgia," (Tr. 2 at 43). TFO Angel had the same understanding. (Tr. 2 at 51, 64). At the time he requested that TFO Angel apply for a tracker warrant for the Jeep, SA Ledgerwood also had a separate large investigation with connections to Coweta County, and TFO Angel was aware of that investigation, (Tr. 2 at 28, 51), and erroneously assumed the Jeep was operating within Coweta County as part of SA Ledgerwood's large, ongoing investigation, (Tr. 2 at 52, 64-65, 67).

TFO Angel agreed to request the tracker warrant and asked SA Ledgerwood to provide him with the probable cause for the search warrant application, (Tr. 2 at 15; Tr. 2, Gov't Ex. 1), which SA Ledgerwood sent via email, stating:

> On August 14, 2017, a reliable HSI confidential informant (CI), whose information has led to several arrests and seizures of multi-kilograms of heroin, cocaine and methamphetamine, advised that the driver of a blue Jeep Cherokee with Georgia tag HU90EW delivered narcotics to

a known location where drug dealers assemble on Winters Chapel Road in Lawrenceville, Georgia. The CI advised that he/she overheard the driver advise the customer that he possessed more narcotics. Agents ran the tag and discovered that the vehicle was registered to a female in Buford, Georgia. HSI Agents discovered that Sandy Springs Police also had information that the vehicle was involved in money laundering.

(Tr. 2, Gov't Ex. 2); see also (Tr. 2 at 16). TFO Angel then "cut and pasted," (Tr. 2 at 50), the substance of SA Ledgerwood's email into the search warrant application as the probable cause to support the warrant, stating:

> ***The facts establishing probable cause that the foregoing described motor vehicle, instrument, article and/or thing are connected with the foregoing crime(s) described herein are:*** On August 14, 2017, a reliable HSI confidential informant (CI), whose information has led to several arrests and seizures of multi-kilograms of heroin, cocaine and methamphetamine, advised that the driver of a blue Jeep Cherokee with Georgia tag HU90EW delivered narcotics to a known location where drug dealers assemble on Winters Chapel Road in Lawrenceville, Georgia. The CI advised that he/she overheard the driver advise the customer that he possessed more narcotics. Agents ran the tag and discovered that the vehicle was registered to a female in Buford, Georgia. HSI Agents discovered that Sandy Springs Police also had information that the vehicle was involved in money laundering.

(Tr. 2, Gov't Ex. 3 at 3-4). In addition to the probable cause statement supplied by SA Ledgerwood, TFO Angel included in the application that the Jeep was being used "within Coweta County," (Tr. 2, Gov't Ex. 3 at 1), to commit crimes and "is or will be located in Coweta County," (Tr. 2, Gov't Ex. 3 at 3 (emphasis omitted)); see also (Tr. 2 at 41-42). This portion of the application was unchanged from a previous

warrant application TFO Angel had submitted and was used as a template for the tracker warrant application. (Tr. 2 at 47-51). A Superior Court Judge for the Coweta Judicial Circuit signed the tracker warrant on August 17, 2017. (Tr. 2, Gov't Ex. 3); see also (Tr. 2 at 20).

TFO Angel informed SA Ledgerwood that the warrant had been signed and sent him a copy of it. (Tr. 2 at 20). SA Ledgerwood gave the warrant a cursory review to confirm it had been signed and that he had authorization to track the Jeep, (Tr. 2 at 36), and he then coordinated with HSI Special Agent Jason Saude ("SA Saude"), TFO Anthony Petron ("TFO Petron"), and TFO Robert Gardner ("TFO Gardner") to install the tracker, (Tr. 2 at 25-26). SA Ledgerwood informed them of the warrant but did not show it to them. (Tr. 2 at 25, 37, 72-73, 76-77). SA Saude installed the tracker on August 22, 2017, (Tr. 2 at 27, 72), while the Jeep was "at the Mosaic Apartments . . . off of Roswell Road in Sandy Springs . . . . [in] Fulton County," Georgia, (Tr. 2 at 73-74, 78); see also (Tr. 2 at 74-76). Agents monitored the information received from the tracker, which led them to the neighborhood of a house located at 1319 Zachary Way, Norcross, Georgia, 30093 ("Zachary Way"). (Tr. 2 at 33-34, 39). TFO Angel did not return the tracker warrant until July 2018, because until that time he had been under the impression that returns did not need to be filed for tracker warrants. (Tr. 2 at 52-53; Tr. 2, Gov't Ex. 5).

Agents began surveillance at Zachary Way the morning of August 28, 2017. (Tr. 1 at 135). They observed the Jeep come and go from Zachary Way multiple times and also observed two adult males, later identified as Brito-Maldonado and

6

Arroyo-Garcia, come and go from Zachary Way in a Ford Mustang and a Honda. (Tr. 1 at 43-44, 87-89, 135-36). Agents asked the Georgia State Patrol ("GSP") to follow the Jeep after it left Zachary Way and to attempt to develop independent probable cause to stop it for a traffic violation. (Tr. 2 at 110-12, 169). GSP Trooper Ian Moremen ("Trooper Moremen") received the assignment, (Tr. 2 at 110), and responded to the vicinity where agents had spotted the Jeep and located it traveling southbound on I-85 in Gwinnett County, Georgia, (Tr. 2 at 111).

Shortly after locating the Jeep, Trooper Moremen observed it failing to maintain its lane by drifting into the left lane near a tractor trailer and then returning to its own lane, and he decided to conduct a traffic stop for the violation he observed. (Tr. 2 at 112). Before conducting the stop, Trooper Moremen had to catch up to the Jeep, identify its tag number, call-in the tag number and report the impending traffic stop over the radio, and activate his emergency equipment, i.e., his "blue-lights," which triggered a video recording that includes the fifteen seconds prior to activation and an audio recording at the moment of activation. (Tr. 2 at 145-47, 162-63).[4]

After stopping the Jeep, Trooper Moremen approached the passenger side of the vehicle and identified the following occupants: the driver, Brito-Arroyo; an adult

---

[4] Trooper Moremen can be heard on the video recording calling in the tag number, see (Tr. 3, Gov't Ex. 4), but he testified that sometimes his radio traffic communications are not always heard "clearly," so he has "to restate it a few times," (Tr. 2 at 113).

female passenger in the front seat, Brito-Arroyo's wife ("Mrs. Brito-Arroyo")[5]; and their child in the back seat.  (Tr. 2 at 113-14).  There was a slight communication barrier because Brito-Arroyo and his wife speak Spanish and Trooper Moremen is not fluent in Spanish, (Tr. 2 at 114), but when Trooper Moremen asked Brito-Arroyo to exit the Jeep, he complied, (Tr. 2 at 114-15; Tr. 3, Gov't Ex. 4).  Trooper Moremen engaged in conversation with Brito-Arroyo, asked him if he was okay, and explained the reason for the traffic stop.  (Tr. 2 at 117; Tr. 3, Gov't Ex. 4).  Trooper Moremen was speaking in English, and Brito-Arroyo answered in English and confirmed that he understood what Trooper Moremen was saying and the reason for the traffic stop.  (Tr. 2 at 117-18; Tr. 3, Gov't Ex. 4).  Trooper Moremen asked questions that he commonly uses when conducting a traffic stop, (Tr. 2 at 119), but he observed that Brito-Arroyo seemed excessively nervous and fidgety, and when Brito-Arroyo could not produce a valid driver's license, Trooper Moremen decided to request consent to search the vehicle, (Tr. 2 at 116-20).  Before he did so, Trooper Moremen placed Brito-Arroyo's two cell phones on the hood of the GSP vehicle in front of its camera "for safety. . . reasons" because Brito-Arroyo had attempted to pull his phone out "multiple times," despite Trooper Moremen asking him to put his phone back in his pocket.  (Tr. 2 at 137-40, 161); see also (Tr. 3, Gov't Ex. 4).

---

[5] In his brief, Brito-Arroyo refers to his wife as "Mrs. Brito" and "Rubi Brito," [Doc. 130 at 23-22], and her name is written on an exhibit as "Rubiceli Sanchez," (Tr. 2, Gov't Ex. 7); [Doc. 130-1], but she will be referred to as Mrs. Brito-Arroyo in this Report and Recommendation.

Trooper Moremen asked Brito-Arroyo if he could read English or Spanish better, and Brito-Arroyo indicated Spanish, (Tr. 2 at 120; Tr. 3, Gov't Ex. 4), so Trooper Moremen presented Brito-Arroyo with a GSP consent-to-search form in Spanish, which Brito-Arroyo signed, (Tr. 2 at 120-21; Tr. 2, Gov't Exs. 6 & 6A).[6] Trooper Moremen observed Brito-Arroyo sign the form and made no threats or promises of any kind to coerce him to sign the form. (Tr. 2 at 122-23, 175; Tr. 3, Gov't Ex. 4). Trooper Moremen was armed, but his weapon was not visible. (Tr. 2 at 175). Other officers on the scene were visibly armed, but their weapons were not drawn. (Id.); see also (Tr. 3, Gov't Ex. 4).

---

[6] The English translation of the consent-to-search from specifically states:

[I], [Brito-Arroyo], by means of this document give my permission to [Trooper] Moremen, officers of the State Highway Patrol, to search the vehicle described in the following, including luggage, containers, and all kinds of content. This includes the removal of any panel or other component of the vehicle with the least intrusive access to any compartment used for the purpose of hiding contraband.

Color: BLU Year: 2002 Make: JEEP Body Type: GRAND CHEROKEE

Plate Number: HU90EW GA

I understand that I have the right to refuse to give permission to the registration described above and to refuse sign this form. I, in addition, state that no promises, threats, force, coercion of any kind has been used against me to make me give permission to the registration described above or to sign this form.

My permission is being given free and voluntarily.

(Tr. 2, Gov't Ex. 6A).

After Brito-Arroyo signed the consent form, a law enforcement officer asked his wife to step out of the Jeep.  (Tr. 2 at 123-24; Tr. 3, Gov't Ex. 4).  As she exited the Jeep, officers searched the bag she was holding because it was capable of concealing a weapon, and they found an object wrapped in green cellophane that they suspected to be drugs but later proved to be cash.  (Tr. 2 at 124-25, 148-49; Tr. 3, Gov't Ex. 4).  Brito-Arroyo and his wife were then handcuffed.  (Tr. 2 at 125, 127).  Officers located a firearm in the console of the vehicle.  (Tr. 2 at 125-26).  Trooper Moremen contacted SA Ledgerwood, and he responded to the scene of the stop.  (Tr. 2 at 126).

Upon arriving at the scene, SA Ledgerwood, who is proficient in the Spanish language, spoke to Brito-Arroyo in Spanish and identified himself as a HSI agent.  (Tr. 2 at 171; Tr. 3, Gov't Ex. 4).  SA Ledgerwood picked up Brito-Arroyo's phones from the hood of the patrol vehicle, looked at them, and handled them in some manner, and the parties stipulated that he obtained from Brito-Arroyo the pass code for one of the cell phones.  (Tr. 3 at 24).  SA Ledgerwood does not precisely recall what he did to the phones, but believes he disabled the security features on one, so that it could be searched more easily later pursuant to a search warrant, (Tr. 2 at 187, 199; Tr. 3 at 24), and placed it in airplane mode so its contents could not be deleted before a warrant was executed, (Tr. 2 at 192-93).  When asked if he "looked through the phones for evidence or anything like that prior to obtaining a search warrant for the phone[s]," he responded that he "[did not] recall," but did not "believe [he] did," and said the "only search of the phones would have been [to] try[] to look for . . .

10

identifying marks." (Tr. 2 at 194-96).[7] After Brito-Arroyo said that he wanted to speak to an attorney, SA Ledgerwood told Brito-Arroyo that he was under arrest for being an illegal alien in possession of a firearm, but did not advise him of his Miranda[8] rights on the scene. (Tr. 2 at 174).

Following the traffic stop of the Jeep, SA Ledgerwood and other law enforcement officers traveled to Zachary Way to conduct a "knock-and-talk," (Tr. 1 at 40), and SA Ledgerwood, who was dressed in plainclothes, approached the front door of the residence, (Tr. 1 at 41). TFO David Schweizer ("TFO Schweizer"), who also was in plainclothes, was nearby, as were Trooper Moremen and another uniformed GSP Trooper, Doug Allen ("Trooper Allen"). (Tr. 1 at 42-43). By the time SA Ledgerwood arrived at the front door, he had been advised by the team

---

[7] Later in the investigation, agents obtained and executed a search warrant for the two cell phones seized from Brito-Arroyo during the traffic stop. (Tr. 2 at 194). HSI Computer Forensic Analyst ("CFA") Chris Lehmann ("CFA Lehmann") testified that he searched three items seized from Brito-Arroyo: a Samsung Gusto 3, which he described as a dumb phone with no security capability (the "dumb phone"); an LG G6 LG-LS993, which he described as a smart phone that had security capability (the "smart phone"); and a SD card for the smart phone, which he explained was "additional memory or storage that's on top of the internal storage," (Tr. 3 at 4, 7-9). CFA Lehmann testified that there are no security features for dumb phones or SD cards, even if the associated smart phone has a pass code, and HSI easily can conduct a forensic search of either, (Tr. 3 at 8, 19-20), but a smart phone may contain security features that make a forensic search more difficult, (Tr. 3 at 5-8). CFA Lehmann could not recall whether the security features were enabled at the time of his search of the smart phone. (Tr. 3 at 9). CFA Lehmann testified that "most" of the files obtained from the search of the smart phone were stored on its SD card, rather than its internal memory. (Tr. 3 at 16, 19; Tr. 3, Gov't Exs. 20-24).

[8] See Miranda v. Arizona, 384 U.S. 436 (1966).

surveilling Zachary Way that there were "at least two adult males in the residence at the time."  (Tr. 1 at 43, 89, 135-36).  Specifically, the surveillance team had observed adult males driving a Ford Mustang and a Honda to and from Zachary Way that day, and both cars were parked at Zachary Way when SA Ledgerwood arrived.  (Tr. 1 at 43-45).

SA Ledgerwood knocked on the door, (Tr. 1 at 45, 121-22), and a female, later identified as Eva Arroyo ("Ms. Arroyo"),[9] answered the door, (Tr. 1 at 46-47).  SA Ledgerwood showed Ms. Arroyo his HSI badge and credentials, (Tr. 1 at 108-09), and spoke to her in Spanish, (Tr. 1 at 47, 122), using a normal conversational tone, (Tr. 1 at 47, 109-11, 122-23).  SA Ledgerwood stood at a normal conversational distance from Ms. Arroyo, with his body canted to the side for his protection, and asked her whether anyone was home, and she said, "no one is here, everyone has left."  (Tr. 1 at 48, 92, 110).  Her denial that anyone else was at Zachary Way raised SA Ledgerwood's suspicion since other law enforcement officers, who had conducted surveillance of the residence that day, advised him that two adult males were there and the two vehicles they had been driving were parked at Zachary Way. (Tr. 1 at 48).  SA Ledgerwood asked Ms. Arroyo if law enforcement could search for additional people at Zachary Way before speaking with her further, to which she responded, "Yes, that's okay," (Tr. 1 at 48, 102), and she understood that she "had

---

[9] Ms. Arroyo was addressed as "Ms. Eva" at times during the evidentiary hearing.  See generally (Tr. 1).

the right to tell them no," (Tr. 1 at 184).  He also asked if she knew of any drugs or weapons in the house, and she said, "No."  (Tr. 1 at 48).

SA Ledgerwood asked Ms. Arroyo to wait outside "because in [his] mind there[ were] people in there, it[ was] not safe, [agents] ha[d]n't made it safe."  (Tr. 1 at 95).  TFO Schweizer waited outside with Ms. Arroyo, (Tr. 1 at 124), as other agents joined SA Ledgerwood and conducted a "normal sweep to look for bodies," (Tr. 1 at 49-50, 106).  During the security sweep, agents did not look in drawers, (Tr. 1 at 51), or under couch cushions, (Tr. 2 at 166), but "in areas where [they] could find a person," (Tr. 1 at 51, 166-67).  During the security sweep, SA Ledgerwood observed green cellophane like that seized from the Jeep.  (Tr. 1 at 51, 99); <u>see also</u> (Tr. 1, Gov't Ex. 3).  When agents cleared the house, they did not find the two adults males believed to be in the residence, and as SA Ledgerwood opened the door into the backyard, he saw within the privacy fence a shed large enough to contain the adult males.  (Tr. 1 at 53-54).  As SA Ledgerwood and Trooper Allen approached the shed, they heard music, and upon opening the shed door, saw two adult males, Brito-Maldonado and Arroyo-Garcia, and what SA Ledgerwood immediately recognized to be a methamphetamine lab.  (Tr. 1 at 54-55; Tr. 1, Gov't Exs. 4 & 5).[10] Agents detained Brito-Maldonado and Arroyo-Garcia, placing both in handcuffs in the backyard.  (Tr. 1 at 56).  Brito-Maldonado was compliant throughout, but

---

[10] SA Ledgerwood testified that he and Trooper Allen opened the shed door "for [their] safety," because they knew there were "two people there, [and they] need[ed] to know who all [was] there before [they sat] down and talk[ed] to [Ms. Arroyo] more."  (Tr. 1 at 99).

Arroyo-Garcia struggled with law enforcement and ultimately broke free and jumped over the backyard fence. (Tr. 1 at 55-56; 138-39). During the twenty-minute chase that ensued, TFO Gardner remained with Brito-Maldonado, who was seated and compliant. (Tr. 1 at 139). Once both of the adult males were detained, Ms. Arroyo reentered the residence and sat in a chair on the back porch. (Tr. 1 at 125-26).

After finding the methamphetamine lab, SA Ledgerwood decided to present to Ms. Arroyo a written request for consent to search Zachary Way. (Tr. 1 at 59-60). SA Ledgerwood sat at a table with Ms. Arroyo, presented her with the HSI consent-to-search form, written in both Spanish and English, that granted "permission voluntarily" for agents "to carry out a complete search" of "1319 Zachary Way Norcross GA," (Tr. 1, Gov't Ex. 1),[11] and SA Ledgerwood "read the form line by line [in Spanish], and then afterwards [] asked her if she understood, and she said she did," (Tr. 1 at 61-62). During this time, SA Ledgerwood used a

_____

[11] The English portions of the consent-to-search form state:

1.     Special Agents of the United States Department of Homeland Security have asked for my permission to carry out a complete search of the following. . . :
           -1319 Zachary Way Norcross, GA
           -cars[]
           . . . .
2.     I have been informed that I have the right to refuse to give my consent.
3.     I give this permission voluntarily.
4.     I hereby authorize the agents to seize any article that in their opinion could be related to this investigation.

(Tr. 1, Gov't Ex. 1).

normal conversational tone, posture, and body language, and made no threats or promises of any kind.  (Tr. 1 at 63).  Ms. Arroyo signed the form.  (Tr. 1 at 62).

When agents discussed the written consent form with Ms. Arroyo, she told them that Brito-Maldonado also lived at Zachary Way, which the agents were unaware of until that time.  (Tr. 1 at 60, 67, 102).[12]  Thereafter, Brito-Maldonado was seated at the table, and SA Ledgerwood presented him with a consent-to-search form identical to the form Ms. Arroyo signed, (Tr. 1, Gov't Ex. 2), and SA Ledgerwood "explained the form, read it line by line [in Spanish] and said do you understand, and [Brito-Maldonado] said he did, and he signed the form," (Tr. 1 at 63-65).  SA Ledgerwood again used a normal conversational tone and made no threats or promises of any kind while discussing the form with Brito-Maldonado. ( Tr. 1 at 65-66).  After Ms. Arroyo and Brito-Maldonado provided the agents with written consent to search, agents searched the residence and found methamphetamine, cash, a weapon, and other evidence in Brito-Maldonado's bedroom, which they did not find during the initial security sweep.  (Tr. 1 at 71, 101, 105).  During the search, Ms. Arroyo and Brito-Maldonado were seated in the living room where they could have withdrawn consent at any time.  (Tr. 1 at 108).

At some point following the traffic stop of the Jeep, TFO Alvarez transported Brito-Arroyo's wife and child to their residence at the Mosaic Apartments.  (Tr. 2 at

_____

[12] Conflicting testimony was presented at the evidentiary hearings regarding the residents of Zachary Way and their respective property interests as will be discussed in greater detail in consideration of Brito-Arroyo's standing to contest the search of the residence.

205, 214).  TFO Petron, who is fluent in Spanish, (Tr. 2 at 204-05), was on the scene

and presented Mrs. Brito-Arroyo with a Spanish consent-to-search form, (Tr. 2 at

205-06; Tr. 2, Gov't Ex. 7); see also [Doc. 130-1], after first confirming that she could

read and understand Spanish, (Tr. 2 at 207).  Mrs. Brito-Arroyo signed the form,

giving law enforcement permission to conduct "a complete search" of the Mosaic

Apartment, [Doc. 130-1 at 1]; see also (Tr. 2 at 208; Tr. 2, Gov't Ex. 7),[13] where she

---

[13] The English translation of the consent-to-search form that Mrs. Brito-Arroyo
signed provides:

> I, [Mrs. Brito-Arroyo], have been informed by US IMMIGRATION
> AND CUSTOMS ENFORCEMENT (ICE) Special Agent
> CADWALLADER of my right to refuse to give the consent so that the
> search of the premise can be carried out, described as follows: . . .
>
>       All Things
>
> I've also been informed by ICE Special Agent CADWALLADER that
> if I give my consent voluntarily for the search of this property to be
> carried out, anything found during said search can be used against me
> in a criminal or civil court, or in any administrative procedure.
>
> I've decided to let the ICE Special Agents CADWALLADER and Police
> carry out a complete search of the premise I occupy, situated at 5675
> Roswell Rd. #10B, Sandy Springs, GA[.]
>
> I authorize the ICE Special Agents to take away letters, papers,
> materials, or other goods of mine they wish.
>
> I allow the ICE Special Agents; of my own free will and intentionally,
> to [perform] [] complete search of my property.  My consent has [] been
> given voluntarily and without being subjected to threats, promises,
> pressure or coercion of any kind.  I've read the aforementioned
> statement and understand my rights.

16

lived with Brito-Arroyo and their child, (Tr. 2 at 177, 209).  When Mrs. Brito-Arroyo reviewed and signed the consent-to-search form, only TFOs Petron and Alvarez, and SA Cadwallader were in her vicinity; the remainder of law enforcement officers were at a distance.  (Tr. 2 at 208-09).  Law enforcement then performed a security sweep, and once the Mosaic Apartment was cleared, allowed Mrs. Brito-Arroyo to enter the residence while they conducted the search.  (Tr. 2 at 210).  TFO Petron stayed near Ms. Brito-Arroyo during the search, so "she [could] clearly acknowledge if there[ was] any time she needed to stop or not," and he did not see any member of law enforcement interact with her in any way that was inappropriate.  (Tr. 2 at 210-11, 214-15).

## II.  DISCUSSION

### A.    Motions to Dismiss or Alternatively to Sever Count 7, [Docs. 59 & 83]

Arroyo-Garcia contends that Count 7 in the indictment, which charges him with illegal reentry, is improperly joined under Rule 8(a) of the Federal Rules of Criminal Procedure to the remaining counts that allege drug trafficking activity.  See [Doc. 83 at 2-6].  He alternatively contends that "[s]hould the Court find that joinder was somehow proper, [he] . . . shows that the Court must sever Count 7 in its Rule 14 discretion and have such count heard in a separate trial" due to "the prejudice occurring to [him] should the jury hear of the predicate conviction underlying and required for proving the Illegal Reentry charge."  [Id. at 6-7 (footnote omitted)].  In response, the government argues that "[b]ecause the illegal reentry and the drug

_____

[Doc. 130-1 at 1-2 (emphasis omitted)].

offenses 'are based on the same act or transaction, and are connected with and constitute parts of a common scheme or plan,' the counts are properly joined in the indictment."   [Doc. 88 at 3 (citing Fed. R. Crim. P. 8(a))].   The government also argues that severance is not warranted in this case because the joinder of Count 7 does not prejudice Arroyo-Garcia, and that "in any event, his argument for severance is premature."   [Id. at 4].

### 1.   *Joinder under Rule 8*

Federal Rule of Criminal Procedure 8(a) provides:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a).   "Rule 8(a) allows joinder of offenses against a single defendant that 'are of the same or similar character,' even if such offenses do not arise at the same time or out of the same series of acts or transactions."   United States v. Maughon, No. 1:11-CR-28-TWT-ECS, 2011 WL 2580342, at *1 (N.D. Ga. May 17, 2011), adopted by 2011 WL 2563240, at *1 (N.D. Ga. June 28, 2011) (citations omitted).   "In addition, joinder is appropriate if the offenses 'are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.'"   Id. (citing Fed. R. Crim. P. 8(a)).   "The Eleventh Circuit construes Rule 8(a) broadly in favor of initial joinder."   United States v. Covington, CRIMINAL ACTION FILE NO. 1:16-CR-145-TWT-JKL-15, 2017 WL 10410076, at *11 (N.D. Ga.

Oct. 5, 2017), adopted by 2018 WL 5016499, at *1 (N.D. Ga. Oct. 16, 2018) (citing United States v. Smalley, 754 F.2d 944, 946 (11th Cir. 1985)).

Arroyo-Garcia argues that "this Court must dismiss the indictment as crafted because the two offenses are inherently dissimilar, cannot be shown to be a part of a single plan or scheme, and lack any logical connection such that the proof of one tends to prove the other." [Doc. 83 at 5-6 (citation omitted)]. The Court, however, disagrees, and finds that the charged offenses are properly joined under Rule 8(a). As the government points out, while "the Eleventh Circuit has not addressed the issue," other courts have found "that illegal reentry is [] sufficiently connected to a [subsequent] offense to support joinder where, as here, the [] crime would not have been committed in the United States had the defendant-alien not illegally entered the United States." [Doc. 88 at 3 (citation omitted)]. "The [drug] offenses charged in Counts One [through Four] are 'connected with' the illegal reentry charge because [Arroyo-Garcia] could not have committed these offenses without being present in the United States." United States v. Alvarado, CRIMINAL CASE NO. 1:17-cr-00065-MR-DLH, 2017 WL 3262255, at *1 (W.D.N.C. July 31, 2017). "Thus, [his] illegal reentry and presence in the United States was a critical act leading to his commission of the offenses charged in Counts One [through Four]." Id. (citation omitted); see also United States v. Lopez, 477 F.3d 1110, 1117 (9th Cir. 2007) (footnote omitted) (finding that various drug-related charges were properly joined with charges for an illegal alien in possession of a firearm and illegal reentry, as each "of the alleged offenses arose from the same act or transaction, and there was

significant overlap in the evidence for all charges"); United States v. Roman, No. 2:13-cr-00602-DN-DBP, 2015 WL 6680216, at *2 (D. Utah Nov. 2, 2015) (finding defendant "could not have committed the offenses charged in this case without actually being present in the United States, which is itself a crime" and thus, "the illegal reentry charge [was] sufficiently connected with the other charges"); United States v. Jaimes-Cruz, Nos. 7:08–CR–139–1, 7:08–CR–139–2, 7:08–CR–139–3, 7:08–CR–139–4, 7:08–CR–139–5, 2009 WL 2225065, at *2 (E.D.N.C. July 24, 2009) (citations omitted) ("find[ing] that all the charges in the superseding indictment constitute part of a common plan" as the "drug conspiracy charged in Count one of the superseding indictment encompasse[d] both the firearm- and immigration-related offenses"); United States v. Estrella, No. S1 01 CR. 984(JFK), 2002 WL 655202, at *1-2 (S.D.N.Y. Apr. 22, 2002) (holding two counts of "narcotics conspiracy" and "illegally reentering the United States after having been deported, in violation of Title 8, United States Code, Section 1326," were "properly joined . . . under Rule 8(a)"); United States v. Espinal-Mejia, 852 F. Supp. 3, 5 (N.D.N.Y. 1994) (finding illegal reentry charge was properly joined with the remaining counts).[14] Thus, it is

---

[14] While Arroyo-Garcia relies only on Rule 8(a) in his motion to dismiss or alternatively to sever Count 7, see [Docs. 59 & 83], "there is some authority that the 'Joinder of Defendants' provision of Rule 8(b) governs joinder of offenses when multiple defendants are charged," Jaimes-Cruz, 2009 WL 2225065, at *2 n.3 (citation omitted). "[E]ven if [] Rule 8(b) is applied, all counts in the indictment are still properly joined." Id.; see also Fed. R. Crim. P. 8(b) ("The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or

**RECOMMENDED** that Arroyo-Garcia's motions to dismiss Count 7 due to it being improperly joined with the remaining counts, [Docs. 59 & 83], be **DENIED**.

### 2.    *Severance under Rule 14*

"Where claims are properly joined under Rule 8(a), a court may nonetheless sever them based on Federal Rule of Criminal Procedure 14(a)," United States v. Obie, CRIMINAL CASE NO. 1:18-CR-007-ODE-JKL, 2018 WL 5045630, at *2 (N.D. Ga. Oct. 17, 2018), which provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).  "Relief under Rule 14 is available where there is a showing that a joint trial will cause the defendant undue prejudice."   United States v. Underwood, 1:16-cr-306-WSD-2, 2017 WL 2875573, at *8 (N.D. Ga. July 5, 2017) (citations omitted); see also United States v. Philpot, 1:15-cr-00028-WSD, 2017 WL 510892, at *2 (N.D. Ga. Feb. 8, 2017).  "The burden on the defendant to show that he will suffer prejudice is a heavy one."  United States v. North, 1:16-cr-309-WSD, 2017 WL 5185270, at *4 (N.D. Ga. Nov. 9, 2017) (citation omitted).  "Claimed prejudice can

_____

separately. All defendants need not be charged in each count."); United States v. Brown, 744 F. Supp. 558, 563 (S.D.N.Y. 1990) ("It would have been impossible for [defendant] to have committed the narcotics offenses charged without actually being present in the United States.  Since it is alleged that [his] presence in the United States was, itself, a crime, the substantive narcotics offenses and the illegal reentry count are sufficiently related for purposes of joinder under Rule 8(b).").

often be addressed by a court by appropriate limiting instructions to assure a jury will consider the charge sought to be severed separately and to not allow evidence or commission of the separate crime to be used in reaching a verdict on the other charge or charges for which the evidence is not relevant." Philpot, 2017 WL 510892, at *2 (citing United States v. Silien, 825 F.2d 320, 323 (11th Cir. 1987) (per curiam)).

Arroyo-Garcia contends that he will suffer prejudice "should the jury hear of the predicate conviction underlying and required for proving the [i]llegal [r]eentry charge." [Doc. 83 at 7]. He specifically alleges that the "jury would learn that he had previously been deported, and that he had been convicted of a prior immigration offense"; that this "conviction, along with the general circumstances of his immigration status, would be inadmissible in adjudicating the drug counts against [him]"; and that the "jury would thus view [his] culpability on the far more serious drug charges . . . against this backdrop of bad character evidence that could be avoided through his being tried separately on the illegal re-entry charge." [Id.].

"But [Arroyo-Garcia] only relies on these broad assertions that are likely to affect many cases with instances of joinder of multiple charges and illegal reentry." Roman, 2015 WL 6680216, at *1 (footnote omitted). "If knowledge of other charges in conjunction with illegal reentry invariably prejudices a jury, then cases including charges of illegal reentry would always have a separate trial." Id. "This is not the rule, however." Id. "Furthermore, [Arroyo-Garcia] has not shown that any potential prejudice cannot be cured with limiting instructions," id. at *2, and the Court "concludes that [his] claimed prejudice can be addressed by instructing the

jury that each count is to be considered separately," <u>Underwood</u>, 2017 WL 2875573, at *9 (citations omitted).   Thus, severance is not warranted, and it is **RECOMMENDED** that Arroyo-Garcia's alternative motions to sever Count 7 from the remaining counts, [Docs. 59 & 83], be **DENIED**.

**B.**   <u>**Motions to Suppress Evidence, [Docs. 64, 77, & 114]**</u>

Brito-Arroyo moves "to suppress physical evidence obtained as [a] result of five illegal searches conducted by law enforcement officers," including:

1.   The installation of a tracking device on [Brito-Arroyo's] 2002 Jeep Grand Cherokee [] pursuant to a warrant issued by a judge lacking jurisdiction to issue the warrant;

2.   The warrantless search of [his] Jeep[;]

3.   The warrantless search of [his] cellular telephone;

4.   The warrantless search of 1319 Zachary Way; and

5.   The warrantless search of Mosaic Apartments[.]

[Doc. 130 at 1-2 (footnote omitted)]; <u>see also</u> [Docs. 77 & 114].   Brito-Maldonado moves to suppress evidence obtained from the search of 1319 Zachary Way.   [Doc. 130 at 2 & n.1; Doc. 64].[15]

---

[15] In his initial motion, Brito-Maldonado also moved to suppress statements, <u>see</u> [Doc. 64], but he did not identify any statements he seeks to suppress at the evidentiary hearings or in his post-hearing briefs, <u>see</u> [Docs. 130 & 139].   Thus, he is deemed to have abandoned his motion to suppress statements.   <u>See United States v. Everett</u>, CRIMINAL ACTION FILE NO. 1:17-CR-020-RWS-JKL, 2018 WL 2189763, at *13 (N.D. Ga. Mar. 30, 2018), adopted by 2018 WL 2187407, at *1 (N.D. Ga. May 10, 2018).

23

1.    *Tracking Device*

Defendant Brito-Arroyo moves to suppress evidence obtained from the tracker installed on the Jeep and fruits thereof, arguing that the tracker warrant was obtained based on false pretenses and issued by a court lacking jurisdiction to authorize the warrant.  [Doc. 114].  Specifically, Brito-Arroyo contends that in the affidavit submitted in support of the application for the tracker warrant, TFO Angel falsely represented to a Superior Court Judge of the Coweta Judicial Circuit that the Jeep was being used to commit drug trafficking offenses within Coweta County and that the vehicle was or would be in Coweta County.  [Id. at 4].  Based on this misrepresentation, the Superior Court Judge found that the Jeep "is or will be located in Coweta County, Georgia," (Tr. 2, Gov't Ex. 3 at 9 (emphasis omitted)), and issued the warrant, authorizing agents to install the tracker "at any public place," and in the event the vehicle travels outside Coweta County, to "continue to monitor the tracking device in any County within the State of Georgia," (id. at 11).  The government acknowledges, [Doc. 133 at 20], and the testimony at the evidentiary hearing established, (Tr. 2 at 41-42), that the Jeep was never observed in Coweta County and consequently, the representations in the affidavit about the vehicle's presence in the county were false.  The government has not disputed Brito-Arroyo's contention that the Superior Court Judge of the Coweta Judicial Circuit lacked jurisdiction to issue the tracker warrant since the Jeep was not in Coweta County when the warrant was issued or when the tracker was installed.  [Doc. 133 at 22-23].  However, the government argues that even if the warrant was not valid under state

24

law due to lack of jurisdiction, suppression is not warranted because a violation of state law does not equate to a Fourth Amendment violation, and in any event, the evidence obtained from the tracker is admissible under the good faith exception to the exclusionary rule because the false statements in the affidavit were not intentional misrepresentations, but the product of mere negligence. [Id. at 21-23]. Brito-Arroyo does not contend that the misrepresentations about the vehicle's presence in Coweta County were intentional, [Doc. 138 at 6], but he does assert that the agents acted recklessly, requiring exclusion of the evidence and precluding application of the good faith exception, [id. at 5-6], and he asserts that the warrant was void *ab initio* due to the Superior Court's lack of jurisdiction, [id. at 4-5].

### a.   Franks Challenge

"A challenge to a search warrant on the grounds of falsity or reckless statements in the supporting affidavit is handled pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)." United States v. Lebowitz, 647 F. Supp. 2d 1336, 1345 (N.D. Ga. 2009), adopted at 1342, aff'd, 676 F.3d 1000 (11th Cir. 2012) (per curiam). "Under *Franks*, if an affidavit submitted to a judicial officer in support of a request for a search warrant contains 'a false statement [made] knowingly and intentionally, or with reckless disregard for the truth,' and if, stripped of that false statement, the affidavit does not establish probable cause, 'the search warrant must be voided. . . .'" O'Ferrell v. United States, 253 F.3d 1257, 1267 (11th Cir. 2001) (alterations in original) (quoting Franks, 438 U.S. at 155–56). Thus, to prevail on a Franks challenge, a defendant "must establish (1) that information

25

contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant." Id.

As previously noted, this case does not involve the intentional inclusion of false information in the affidavit submitted to obtain the tracker warrant.[16] Rather, the issue presented is whether false information was included in reckless disregard for the truth. While "[t]he meaning of an intentional falsehood is self evident," United States v. Kunen, 323 F. Supp. 2d 390, 395 (E.D.N.Y. 2004), "[t]he same may not be said of what constitutes a reckless disregard for the truth," id. "Whether a statement is made with reckless disregard for the truth is a question that, although touched on, was not fully answered by the Supreme Court in *Franks*," United States v. Clapp, 46 F.3d 795, 800 (8th Cir. 1995) (footnote omitted), as the decision "did not define 'reckless disregard for the truth,' other than to suggest that the standard required more than mere negligence on the part of the affiant," United States v. Freel, No. 01-40062-01-RDR, 2001 WL 1568353, at *7 (D. Kan. Nov. 30, 2001) (quoting Franks, 438 U.S. at 171). Thus, "[d]etermining whether an omission was made recklessly presents particular difficulties," United States v. Ali, 870 F. Supp. 2d 10, 28 (D.D.C. 2012), because, "as the Court of Appeals for the District of Columbia Circuit has lamented, 'unfortunately, the Supreme Court in *Franks* gave no guidance

---

[16] Nor does Brito-Arroyo contend that the affidavit otherwise was lacking probable cause to support installing a tracker on the Jeep. See [Doc. 114].

concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that negligence or innocent mistake is insufficient,'" id. (internal marks omitted) (quoting Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000)).

Courts have articulated different formulations of the reckless disregard standard in the Franks context, with some focusing on "what the affiant 'believed or appropriately accepted' as true," Clapp, 46 F.3d at 800 (citation omitted) (quoting United States v. Lueth, 807 F.2d 719, 726 (8th Cir. 1986)); see also United States v. Schmitz, 181 F.3d 981, 986–87 (8th Cir. 1999) (second and third alterations in original) (citation omitted) (explaining that the Eighth Circuit's "test for determining whether an affiant's statements were made with reckless disregard for the truth is . . . whether, viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his [or her] statements or had obvious reasons to doubt the accuracy of the information he [or she] reported"), while other courts "have explicitly adopted the First Amendment libel standard for determining whether a statement is made with reckless disregard for the truth," Clapp, 46 F.3d at 800 (citations omitted) (citing United States v. A Residence Located at 218 Third St., 805 F.2d 256, 258 (7th Cir. 1986); United States v. Davis, 617 F.2d 677, 694 (D.C. Cir. 1979)), and "have looked to whether the affiant 'in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein,'" id. at 801 (footnote omitted) (quoting United States v. Dorfman, 542 F. Supp. 345, 369 (N.D. Ill. 1982)); see also Freel, 2001 WL 1568353, at *7 (quoting Bruning v. Pixler, 949 F.2d 352, 357 (10th Cir. 1991)) ("The Tenth

Circuit has indicated that 'reckless disregard for the truth' occurred when 'the affiant in fact entertained serious doubts as to the truth of his allegations.'").  The Second and Sixth Circuits have described "[t]his inquiry, which looks to the mental states of mind of government officials," as "a 'subjective' test rather than an 'objective' one," United States v. Rajaratnam, 719 F.3d 139, 153 (2d Cir. 2013) (citing Farmer v. Brennan, 511 U.S. 825, 838–40 (1994) (discussing the difference between "subjective" and "objective" tests)); see also United States v. Cican, 63 F. App'x 832, 835 (6th Cir. 2003) (unpublished) ("[M]ost circuits [that have had occasion to address the issue] have adopted a subjective test for recklessness similar to that used in First Amendment libel cases."), whereas the Eighth Circuit has "declined to adopt a definition of 'reckless disregard' that incorporates the 'subjective' versus 'objective' terminology," Schmitz, 181 F.3d at 986.

Although "the Eleventh Circuit has yet to 'stake[ ] out a bright line' for recklessness in the *Franks* context," United States v. Anderson, CR417-090, 2017 WL 7051579, at *3 n.4 (S.D. Ga. Nov. 30, 2017), adopted by 2017 WL 6617049, at *1 (S.D. Ga. Dec. 28, 2017) (alteration in original) (citation omitted), at least one district court within the circuit has observed that "[t]he Eleventh Circuit defines 'reckless disregard for the truth' to include instances where the affiant 'should have recognized the error, or at least harbored serious doubts' about his representations," United States v. Spates, No. 8:10-cr-516-T-30MAP, 2011 WL 975011, at *1 n.3 (M.D. Fla. Mar. 2, 2011), adopted by 2011 WL 974465, at *1 (M.D. Fla. Mar. 18, 2011) (quoting United States v. Kirk, 781 F.2d 1498, 1502–03 (11th Cir. 1986)).

In Kirk, the Eleventh Circuit affirmed the district court's finding that law enforcement agents acted in reckless disregard for the truth by including in an affidavit for a residential search warrant a misidentification of two individuals observed during surveillance of another drug trafficking suspect named Gray.[17] 781 F.2d at 1502–03.   Specifically, the Eleventh Circuit found that the "agents' recklessness lies in the fact that they paid no attention to the physical descriptions of the individuals' height, weight, hair color, and age which were listed on the photographs." Id. at 1503.  The Eleventh Circuit added that, even if the agents who made the initial misidentification were only negligent, the other agents involved in the investigation, who sought the search warrant and "who were also a part of the surveillance team, should have recognized the error, or at least harbored serious doubts as to whether [the two individuals] were in fact the two men whom they had observed with Gray," id., because those agents were personally familiar with some of the suspects and their physical appearances from other unrelated investigations and "the photographs of the suspects which were used in the identification had been posted on the bulletin board in the DEA office for 'about a year-and-a-half,'" id.  The Eleventh Circuit cited as other evidence in the record that supported finding the

---

[17] "While the Eleventh Circuit found that the agents' misidentification in the warrant affidavit was made with reckless disregard for the truth, the court further held that the affidavit was otherwise sufficient to establish probable cause for a search of the residence," and "therefore reversed the district court's suppression of the evidence found at the residence."   Daniels v. Bango, CASE NO. 10-80077-CIV, 2011 WL 13175206, at *9 n.18 (S.D. Fla. Aug. 30, 2011), adopted by 2011 WL 13175222, at *1 (S.D. Fla. Sept. 28, 2011), aff'd in part, 487 F. App'x 532 (11th Cir. 2012) (unpublished) (citations omitted).

misidentification was reckless the fact that the drug trafficking suspect who was the initial focus of the investigation, Gray, denied knowing one of the individuals observed during the surveillance and said a person different from the two who were misidentified may have been peripherally involved in the drug scheme, and when the agents who sought the search warrant brought the discrepancy to the attention of the agents who made the initial misidentification, those agents "acknowledged that they could have been wrong in their identification." Id.  Finally, the Eleventh Circuit found these circumstances distinguishable from the facts in United States v. Edwards, 602 F.2d 458 (1st Cir. 1979), "where the agents had no reason to suspect that the information upon which they were relying was incorrect." Id. (footnote omitted).

Regardless of whether the reckless disregard standard is properly described as subjective or objective, the undersigned finds that the agents were negligent by including incorrect information about the presence of the vehicle in Coweta County when obtaining the tracker warrant, but they did not act with reckless disregard for the truth in obtaining the warrant.  The evidence in this case demonstrates that there was a miscommunication in the course of obtaining the search warrant as SA Ledgerwood communicated accurate information to TFO Angel regarding the Jeep that established probable cause to obtain a tracker warrant, but TFO Angel erroneously presumed that the vehicle was part of a different investigation that SA Ledgerwood was conducting in Coweta County, and "[u]nder Franks, negligent police miscommunications in the course of acquiring a warrant do not provide a

basis to rescind a warrant and render a search or arrest invalid." Herring v. United States, 555 U.S. 135, 145 (2009).

Unlike in Kirk, there is no evidence that TFO Angel recklessly disregarded information supplied by SA Ledgerwood regarding the vehicle as he fully included the details about the Jeep supplied by SA Ledgerwood in the facts supporting probable cause for the tracker warrant, but he erroneously added that the vehicle had been in Coweta County in connection with the drug trafficking conspiracy under investigation. There is no evidence that SA Ledgerwood communicated erroneous information to TFO Angel as he simply provided the facts that he believed supported probable cause and asked TFO Angel to obtain a tracker warrant for the vehicle. While it would have been prudent for TFO Angel to confirm with SA Ledgerwood his belief that the vehicle was part of the Coweta County investigation before including in his affidavit the statement that the vehicle was being used to commit drug trafficking offenses within Coweta County, his failure to do so does not rise to reckless disregard for the truth under Franks.[18] United

---

[18] Brito-Arroyo also argues in a supplemental brief that TFO Angel's failure to file a return for the tracker warrant is "further evidence of either 1) a disregard for the law on part of the agents, or 2) an ignorance of the law by the agents that is either reckless or an intentional ignorance/indifference of the law." [Doc. 140 at 1 n.1]. Brito-Arroyo did not obtain leave of court to file this supplemental brief, nor has he explained why these arguments were not included in his reply. Therefore, the Court need not consider these untimely arguments. United States v. Torres, Criminal Action No. 1:06-CR-00351-WSD-LTW, 2008 WL 11380151, at *4 (N.D. Ga. Mar. 21, 2008), adopted by 2008 WL 11380103, at *5 (N.D. Ga. Oct. 9, 2008). Nevertheless, even if the arguments are considered, Brito-Arroyo acknowledges that "the failure to file a return on a warrant is not a basis to suppress a search," [Doc. 140 at 1 n.1]; see also United States v. Wilson, 451 F.2d 209, 214 (5th Cir. 1971)

States v. Hammett, 236 F.3d 1054, 1058–59 (9th Cir. 2001), overruled on other grounds as recognized by United States v. Perea-Rey, 680 F.3d 1179 (9th Cir. 2012) (holding that misstatement in warrant affidavit was not made with reckless disregard for the truth because it was highly probable that there was a miscommunication between the investigating officer and the officer who drafted the affidavit); United States v. Dale, 991 F.2d 819, 844 (D.C. Cir. 1993) (per curiam) (citations omitted) ("[I]n general, the failure to investigate fully is not evidence of an affiant's reckless disregard for the truth.").

In distinguishing between conduct that is negligent, as opposed to reckless, the Court also finds instructive the Eighth Circuit's decision in Clapp, where it ruled that neither an agent's misleading statement about having participated in an interview conducted by another agent, nor his failure to precisely report the details of the interview constituted reckless disregard for the truth, but instead evinced only negligent conduct. 46 F.3d at 800–01. In Clapp, an agent named Tweedy stated in an affidavit in support of a search warrant that he had "participated in an interview" of a particular witness, Smith, when in fact, he had not interviewed the witness, but had only overheard Agent DiPrima's interview of Smith from his desk 15-20 feet away, while he was working on an unrelated matter. Id. at 799-800 (internal marks omitted). Tweedy further stated in his affidavit that Smith "didn't know where the

_____

(refusing to suppress evidence on the basis of a failure to properly return and file a warrant), and the Court finds the failure to timely file the return to be further evidence of negligence on the part of the agents that is hardly commendable, but fails to rise to recklessness.

remaining $329,600.95 went," but this statement about Smith's knowledge regarding the remaining funds was "plainly inaccurate," as Smith had in fact advised DiPrima regarding the disposition of the funds. Id. (internal marks omitted). In fact, "[a]ll of this information was included in DiPrima's report on his interview with Smith," but that interview report was not reviewed by Tweedy. Id. at 800-01. The court found that this conduct, while negligent, "was not reckless" as required under Franks, explaining:

> Had Tweedy admitted to having read DiPrima's report yet nevertheless included in the affidavit that Smith did not know where the remaining money went, there might well be grounds for concluding that Tweedy acted in reckless disregard for the truth. Tweedy, however, testified only that he thought the statement was made sometime during DiPrima's interview with Smith.

Id. at 801 (footnote omitted).

Similar to Tweedy's erroneous statement about the disposition of the funds, TFO Angel believed that the vehicle had been in Coweta County in connection with another investigation being conducted by SA Ledgerwood, even though it had not, and while his erroneous belief could have been corrected had he consulted with SA Ledgerwood, he did not do so, and his failure to be more thorough in confirming his belief was negligent, but not reckless. Edwards, 602 F.2d at 465 (finding that "reliance on information supplied by a fellow agent, albeit in error in this instance, was not so unwarranted as to undermine the validity of the search warrant under the standard of Franks"). TFO Angel did not include the statements about the vehicle being in Coweta County despite having information to the contrary or information that reasonably called into question his belief based on his awareness

33

of the other investigation.[19]  The fact that SA Ledgerwood's summary statement for

probable cause mentioned that the vehicle was registered to a female in Buford,

Georgia, had delivered narcotics to a known location where drug dealers assemble

on Winters Chapel Road in Lawrenceville, Georgia, and was the subject of a money

laundering investigation by the Sandy Springs Police did not directly contradict TFO

Angel's mistaken belief that the vehicle had been used in Coweta County such that

he "should have recognized the error, or at least harbored serious doubts." Kirk, 781

F.2d at 1503; see also Henry v. City of Pembroke Pines, CASE NO. 09-CIV-61399-

ALTONAGA/Brown, 2010 WL 11597649, at *9 (S.D. Fla. Aug. 3, 2010)

(distinguishing Kirk and noting that there was "much more than discrepancies in

[the physical descriptions of the suspects] that prompted the court's conclusion of

recklessness").  Thus, Brito-Arroyo has not demonstrated that the agents acted in

reckless disregard of the truth in obtaining the tracker warrant to support

suppression under Franks.  United States v. Railey, 481 F. App'x 545, 548 (11th Cir.

---

[19] Brito-Arroyo cites United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001), for the proposition that "where an affiant makes affirmative characterizations about critical matters in an affidavit, the court 'will assume that this was a deliberate or reckless misrepresentation.'" [Doc. 138 at 5-6]. However, the Eleventh Circuit did not adopt a presumption of recklessness for Franks issues, but simply assumed in that case that the affiant's representations about the reliability of past cooperation by informants who had not, in fact, previously cooperated was a deliberate or reckless misrepresentation because it was "unclear how [the agent] could have made such statements of an affirmative character for which there was no basis without having acted either deliberately or recklessly." Novaton, 271 F.3d at 987.  Here, TFO Angel credibly testified that he mistakenly believed that the tracker warrant pertained to a different investigation that SA Ledgerwood was conducting in Coweta County, which is a plausible explanation for his erroneous representations in the affidavit. (Tr. 2 at 52, 64-65, 67).

2012) (per curiam) (unpublished) (finding that affiant "negligently included" an erroneous assumption in the search warrant affidavit, but that defendant failed to show that the inclusion was done "with knowledge or in reckless disregard for the truth"); United States v. Levesque, 625 F. Supp. 428, 448 (D.N.H. 1985), aff'd, 879 F.2d 853 (1st Cir. 1989) (unpublished) (citations omitted) ("Erroneous assumptions in an affidavit made by a law enforcement officer from information he has received does not amount to reckless inclusion of false statements in an affidavit.").

### b.   Superior Court Jurisdiction

Independent of the Franks issue, Brito-Arroyo contends that evidence obtained from the tracker and fruits thereof should be suppressed because the warrant was void _ab initio_ since it was issued by a Superior Court Judge of the Coweta Judicial Circuit for a vehicle beyond that court's jurisdiction as it is undisputed that the vehicle had never been observed in Coweta County and the tracker was installed outside of Coweta County. [Doc. 114 at 2-3; Doc. 130 at 13-15; Doc. 138 at 4-5]. The government responds that the violation of state law occasioned by the issuance and installation of the warrant beyond the jurisdiction of the Coweta Judicial Circuit is inconsequential to the Fourth Amendment analysis and that suppression is not warranted because the agents who installed the tracker relied in good faith on the assertion of the case agent, SA Ledgerwood, that the warrant had been issued. [Doc. 133 at 21-23].

Brito-Arroyo correctly points out in his reply, [Doc. 138 at 1, 4-5], that the government has not directly contested his contention that the tracker warrant was

void *ab initio* because the vehicle on which the tracker was installed was beyond the court's jurisdiction both when the warrant was issued and when the tracker was installed, see [Doc. 133 at 19-23].  In the absence of any contrary argument from the government, the Court accepts Brito-Arroyo's contention that the tracker warrant was void *ab initio* under state law.  [Doc. 114 at 2-3; Doc. 130 at 13-14].  However, even if the collection of the tracker information using a warrant that was void *ab initio* violated state law, the government correctly contends, [Doc. 133 at 21-23], that "courts in our circuit consistently have held that a violation of state law in procuring a warrant or conducting a search is immaterial to whether a federal court must suppress evidence," United States v. McCray, CRIMINAL ACTION FILE NO. 1:15-cr-212-WSD/AJB, 2017 WL 9472888, at *13 (N.D. Ga. June 15, 2017), adopted by 2017 WL 3141172, at *14 (N.D. Ga. July 25, 2017).[20]

The Eleventh Circuit has ruled that even where a search warrant "may not have complied with certain conditions required by the state, it did not offend any constitutional principles that support the suppression of evidence."  United States

---

[20] Brito-Arroyo relies on United States v. Master, 614 F.3d 236 (6th Cir. 2010), to support his contention that a warrant issued beyond the jurisdictional limits of state law violates the Fourth Amendment, [Doc. 138 at 4], but this decision is not binding and appears to be inconsistent with Eleventh Circuit authority, see McCray, 2017 WL 9472888, at *11-13 (rejecting argument based on Master and citing cases within the Eleventh Circuit holding, among other things, that "complaints that the evidence was obtained in violation of state law are of no effect").  However, even if the Court followed the ruling in Master, the Sixth Circuit concluded that the good faith exception is available even when a warrant is void *ab initio*, 614 F.3d at 241-43, and Brito-Arroyo's motion is still due to be denied for the alternative reasons discussed hereinafter.

v. Gilbert, 942 F.2d 1537, 1542 (11th Cir. 1991) (footnote omitted). In United States
v. Simms, 385 F.3d 1347, 1355–56 (11th Cir. 2004), "the Eleventh Circuit held that the
GPS tracking of a vehicle into Alabama, even though the authorizing court order
only allowed tracking in Texas, did not violate the Fourth Amendment," United
States v. Brewer, 915 F.3d 408, 414 (7th Cir. 2019). The Eleventh Circuit explained
in Simms that even if "the use of the tracking device beyond the bounds of the
warrant may have violated Texas state law governing the installation and use of
mobile tracking devices, this still leaves us several steps away from being able to
reach a conclusion that suppression is warranted." 385 F.3d at 1355. Citing Gilbert,
the Eleventh Circuit noted that "constitutional considerations, rather than the
demands of state law, direct our resolution of this issue," id. at 1355-56 (internal
marks omitted), and ruled that the "use of the tracking device outside the scope of
the warrant simply does not implicate federal constitutional concerns, and there is
therefore no 'taint' for purposes of applying the exclusionary rule," id. at 1356.

The Seventh Circuit, citing Gilbert and Simms, recently rejected an argument
similar to Brito-Arroyo's seeking to suppress evidence obtained in violation of the
jurisdictional limitations of a state tracker warrant, ruling that the Fourth
Amendment provides no remedy for "noncompliance with a state-based, ancillary
restriction in the warrant," Brewer, 915 F.3d at 414-15 (footnote omitted). In Brewer,
an FBI task force officer obtained a warrant from an Indiana state court magistrate
to install a GPS tracking device on a vehicle suspected of being involved in multiple
bank robberies in Indiana, Illinois, and Ohio. Id. at 412. The warrant permitted

tracking of the vehicle within the state of Indiana for period of 45 days.  Id.  A few days after the tracker was installed, a task force officer noticed the vehicle was moving west, and he monitored it as it left Indiana and traveled to Los Angeles, California.  Id.  The task force officer "was unaware that the warrant limited the monitoring to Indiana, and he failed to consult it while tracking the car."  Id.  The task force officer alerted his counterparts in Los Angeles, and the defendant and his companion were stopped and arrested shortly after robbing another bank.  Id.

The defendant argued "that by not abiding by the in-state limitation set forth in the warrant the government effectively conducted a warrantless search," id. at 413, but the Seventh Circuit rejected this argument because "[l]ike certain warrant terms, state law does not by proxy heighten the Fourth Amendment's protections," id. at 414 (citations omitted).[21]  Thus, the Seventh Circuit reasoned that if "law enforcement executes a state-issued warrant beyond the limits of state law, the search may nevertheless comply with the Fourth Amendment."  Id. (citation omitted).  Because the Fourth Amendment's requirements of probable cause and particularity were satisfied, "the warrant's in-state limitation was, at most, a state-law problem."  Id. (citation omitted).  Here, as in Brewer, Brito-Arroyo seeks to suppress evidence obtained in violation of jurisdictional limitations on the face of the warrant and under state law, but these state law violations do not implicate the

---

[21] The Seventh Circuit noted that it was immaterial to its analysis whether the in-state limitation in the warrant was based on state law or "a vestige from some stock template."  Brewer, 915 F.3d at 415 n.1.

Fourth Amendment, and it is undisputed that the tracker warrant in this case met the Fourth Amendment's requirements of probable cause and particularity.[22] Simms, 385 F.3d at 1355–56. Consequently, there was no Fourth Amendment violation, and it is **RECOMMENDED** that Brito-Arroyo's motion to suppress the tracker warrant evidence be **DENIED**, and the Court need not reach the government's good faith argument.

### c.   Good Faith Exception to Exclusionary Rule

Alternatively, even if Brito-Arroyo could establish a Fourth Amendment violation because the tracker warrant was void *ab initio*, suppression of the information collected would not be the automatic consequence. "Although the Fourth Amendment expressly protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' the Constitution does not explain how courts ought to treat evidence seized in violation of that command." United States v. Smith, 741 F.3d 1211, 1218 (11th Cir. 2013) (alteration in original). "The exclusionary rule is thus a 'prudential' doctrine . . . created by [the Supreme] Court to 'compel respect for the constitutional guaranty.'" Id. (alterations in original) (quoting Davis v. United States, 564 U.S. 229, 236 (2011)). "In designing the exclusionary rule, the Court did not aim to 'redress

---

[22] Brito-Arroyo's reliance on Judge Johnson's ruling in United States v. Travitz, Criminal Action No. 4:14-cr-00021-HLM-WEJ (N.D. Ga. Dec. 9, 2014), is misplaced because, unlike here, the government in that case conceded there was a Fourth Amendment violation. Moreover, as discussed hereinafter, factors that contributed to Judge Johnson's finding that there was no good faith reliance on the warrant are absent in this case.

the injury' occasioned by an unconstitutional search; rather, as the Supreme Court has 'repeatedly held,' the 'sole purpose' of the exclusionary rule 'is to deter future Fourth Amendment violations.'"   Id. (citation and internal marks omitted). "[S]uppression is not an automatic consequence of a Fourth Amendment violation." Herring, 555 U.S. at 137. "Instead, exclusion is a remedy of 'last resort,' justified *only* where the 'deterrence benefits of suppression' outweigh the 'substantial social costs' of 'ignor[ing] reliable, trustworthy evidence bearing on guilt or innocence.'" Smith, 741 F.3d at 1219 (alteration in original) (quoting Davis, 564 U.S. at 237).   "The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct." United States v. Bickle, No. 2:10-cr-00565-RLH-PAL, 2011 WL 3798225, at *23 (D. Nev. July 21, 2011), adopted by 2011 WL 3705446, at *1 (D. Nev. Aug. 24, 2011) (citation omitted). "Accordingly, when police mistakes are the result of negligence rather than systematic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'" Id. (quoting Herring, 555 U.S. at 147-48).   Therefore, the Court will consider whether the Leon good faith exception applies to a warrant void *ab initio*.

"Whether the good faith exception is available for a warrant that is void *ab initio* is an open question in the Eleventh Circuit." United States v. Taylor, 250 F. Supp. 3d 1215, 1236 (N.D. Ala. 2017). However, the weight of authority supports the conclusion that it does apply in these circumstances. See, e.g., United States v. Horton, 863 F.3d 1041, 1050 (8th Cir. 2017) (holding that the "good faith" exception applied to a warrant issued outside of a Magistrate Judge's jurisdiction); United

States v. Wheeler, CRIMINAL ACTION FILE NO. 1:15-CR-390-MHC-JFK, 2017 WL 3589564, at *2–4 (N.D. Ga. Aug. 21, 2017); United States v. Barnes, No. 3:15-CR-112-J-39PDB, 2017 WL 10296873, at *18 (M.D. Fla. May 8, 2017), adopted as modified by 2017 WL 10296872, at *4 (M.D. Fla. Sept. 1, 2017).  Courts have reasoned that "the legal status of the warrant under the Fourth Amendment does not inform the decision of whether the good faith exception is available in a given case; that inquiry is separate and must be considered in light of the exclusionary rule's purpose and the officers' conduct at issue."  United States v. Werdene, 188 F. Supp. 3d 431, 451 (E.D. Pa. 2016) (citing Master, 614 F.3d at 243).

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court outlined four situations in which the good faith exception does not apply and suppression is warranted: (1) where the issuing judge was mislead by information the affiant knew was false or which was made with reckless disregard for the truth; (2) where the issuing judge abandoned his or her role as a neutral and detached judicial officer; (3) where the affidavit in support of the warrant so lacked an indicia of probable cause as to render belief in its existence entirely unreasonable; and (4) where the warrant itself was so facially deficient that the executing officers could not reasonably presume it to be valid.  Id. at 923; see also United States v. Accardo 749 F.2d 1477, 1480 n.4 (11th Cir. 1985).  The fourth situation is the only one arguably at issue since this is not a case where false information was provided knowingly or in reckless disregard of the truth, as previously discussed, and there is no contention that the issuing judge abandoned his role as a neutral judicial officer or that the

affidavit was so lacking in probable cause as to render belief in its existence unreasonable.

Brito-Arroyo essentially argues that the good faith exception should not apply because the tracker warrant was facially deficient since the Coweta Superior Court lacked jurisdiction to issue the warrant and the agents should have known that the warrant was invalid because "a reasonable sheriff's deputy in Georgia knows he must obtain a warrant in the county where the search is conducted." [Doc. 138 at 5 (quoting Travitz, Criminal Action No. 4:14-cr-00021-HLM-WEJ, at [Doc. 22 at 21])]. The Travitz case relied on by Brito-Arroyo is readily distinguishable. In that case, a Lieutenant in the Cobb County Sheriff's Office applied to a Cobb County magistrate for a warrant to search computers seized from the defendant, and when the magistrate inquired if the computers were in Cobb County, the Lieutenant told him they were, but that Cherokee County analysts were going to search the computers. Travitz, Criminal Action No. 4:14-cr-00021-HLM-WEJ, at [Doc. 22 at 7-10]. The magistrate asked if the analysts were coming to Cobb County to conduct the search, and the Lieutenant responded that he was going to check with a Captain from Cherokee County to confirm, but if the computers had to be examined in Cherokee County, then they would have to get a secondary search warrant, and the magistrate affirmed that his authority was restricted to a search warrant to be conducted within the county lines of Cobb County. Id. at [Doc. 22 at 9-10]. Despite this explicit exchange, the search warrant was executed in Cherokee County, not Cobb County. Id. at [Doc. 22 at 10].

42

In <u>Travitz</u>, the government did not contest that the search of the computers violated the Fourth Amendment, and instead argued that the evidence recovered from the search should not be suppressed under the good faith exception to the exclusionary rule. <u>Id.</u> at [Doc. 22 at 14]. Because the burden to establish good faith rested with the government and the record did not disclose how the investigators came to search the computers in Cherokee County instead of Cobb County, Judge Johnson ruled that the evidentiary gaps redounded to the government's detriment. <u>Id.</u> at [Doc. 22 at 20]. In particular, Judge Johnson pointed out that the government did not attest to the Lieutenant's good faith, and given his exchange with the magistrate about the jurisdictional limits of his authority, the fact that the magistrate's admonition went unheeded suggested gross negligence, if not reckless or deliberate conduct on the part of the Lieutenant, <u>id.</u> at [Doc. 22 at 22], which supported application of the deterrence rationale of the exclusionary rule because "[i]ntentional attempts [by police] to avoid adhering to jurisdictional limitations imposed by state law is conduct that can and should be considered and deterred by the judiciary," <u>id.</u> at [Doc. 22 at 24 (alterations in original) (internal marks omitted) (quoting <u>Master</u>, 614 F.3d at 243)].

In this case, there is no evidence of an intentional attempt to avoid adhering to state law jurisdictional limitations.[23]  As previously discussed, the error in obtaining the warrant from a Superior Court Judge of the Coweta Judicial Circuit

---

[23] The warrant in <u>Travitz</u> was invalidated under the first <u>Leon</u> factor, which as previously explained, is not at issue here since the agents acted negligently, not intentionally or in reckless disregard of the truth.

was due to negligence, not recklessness or intentional conduct, and the evidence presented regarding the execution of the warrant similarly establishes that the law enforcement agents acted negligently, not intentionally, in violating state law jurisdictional limitations. TFO Angel erroneously believed that the tracker warrant related to an ongoing investigation by SA Ledgerwood in Coweta County and therefore had no reason to question the jurisdictional limitations of the warrant issued by the Superior Court Judge of the Coweta Judicial Circuit. TFO Angel communicated to SA Ledgerwood that the warrant had been signed and provided him a copy, and SA Ledgerwood gave it a cursory review to confirm it had been signed and that he was authorized to track the Jeep before informing other agents, who did not see the warrant, that it had been signed, and they were authorized to install the tracking device. See Whiteley v. Warden, 401 U.S. 560, 568 (1971) ("[P]olice officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause"); United States v. Brown, 596 F. Supp. 2d 611, 626–27 (E.D.N.Y. 2009), aff'd sub nom. United States v. Armstrong, 406 F. App'x 500 (2d Cir. 2010) (unpublished), and aff'd sub nom. United States v. Midyett, 457 F. App'x 7 (2d Cir. 2011) (unpublished) (citation omitted) ("An officer may rely on information from another officer that a search warrant has issued in order to begin executing that warrant by detaining an occupant of the location without having seen the warrant.").

Unlike in <u>Travitz</u>, the government presented evidence of the good faith belief of the law enforcement agents involved in this case, and there is no evidence that any of them were aware of the jurisdictional limitations of warrants issued by superior court judges in Georgia and disregarded those limitations.[24]   To the contrary, SA Ledgerwood and TFO Angel testified that they believed superior court judges had statewide jurisdiction to issue a tracker warrant, and there is at least an arguable basis for their erroneous understanding since the warrant specifically stated that "installation of the tracking device [was] authorized in any public place," (Tr. 2, Gov't Ex. 3 at 11), and that if the vehicle left Coweta County, investigators could monitor the tracking device "in any County within the State of Georgia," (<u>id.</u>), and Brito-Arroyo has not "provided any cases that hold that [federal law enforcement agents] should know and understand the scope of state-court judges' jurisdiction" in order to invoke the good faith exception to the exclusionary rule,[25]

---

[24] In <u>Travitz</u>, the Lieutenant specifically acknowledged to the magistrate that he was aware of the jurisdictional limitations of the warrant, and it was his "recognition of his obligation under state law" that Judge Johnson cited as suggesting "a reasonable sheriff's deputy in Georgia knows he must obtain a warrant in the county where the search is conducted." <u>Travitz</u>, Criminal Action No. 4:14-cr-00021-HLM-WEJ, at [Doc. 22 at 21].

[25] TFO Angel testified that, as a Deputy Sheriff, he had statewide authority to request warrants, but since he erroneously assumed that the Jeep was involved in the Coweta County investigation, he had no reason to question the validity of the warrant. SA Saude, who installed the tracker, reasonably relied on his fellow agent's representation that the warrant had been issued, so SA Ledgerwood was the only one who perhaps could have detected the state law jurisdictional error had he read the warrant more carefully.   However, given his erroneous understanding of the scope of the territorial jurisdiction of superior court judges, and since the warrant

United States v. Govea-Vazquez, 962 F. Supp. 2d 1325, 1332 (N.D. Ga. 2013), aff'd

sub nom. United States v. Lara, 588 F. App'x 935 (11th Cir. 2014) (per curiam)

(unpublished).  Although the record in this case to support the reasonableness of the

agents' erroneous belief regarding the scope of the superior court judge's

jurisdiction is not as strong as in Lara, where there were conflicting court decisions

and an amendment to the state statute during the time the warrants were obtained,

the absence of any deterrent value from exclusion in this case when weighed against

the cost of suppression is as great since suppression of the tracker warrant obtained

due to negligence would arguably result in suppression of all other evidence in the

case under the fruit of the poisonous tree argument advanced by Brito-Arroyo.[26]

Govea-Vazquez, 962 F. Supp. 2d at 1332; see also United States v. Gutierrez, Case

No. 3:17-cr-225-J-32MCR, 2018 WL 5839867, at *2 (M.D. Fla. Nov. 8, 2018) (applying

---

authorized installing the tracker "in any public place" and tracking of the vehicle
throughout the state, the Court is not convinced that he would have recognized the
jurisdictional issue with the warrant or necessarily should have known the warrant
was not issued in compliance with state law.  Indeed, in his motion to suppress the
tracker warrant, Brito-Arroyo "presumes that the jurisdictional deficiency of this
warrant was not apparent to an attorney for the Government who does not practice
in the Georgia criminal courts."  [Doc. 114 at 5 n.1].

[26] The issues presented in this case with respect to the tracker warrant based
on the erroneous information included in the affidavit could easily have been
avoided with better communication between the agents, and this case is one that
"law enforcement officers would do well to study as an example of the potential
hazards that accompany an inattention to detail."  Clapp, 46 F.3d at 801 n.7.
Education, not exclusion of evidence, is the appropriate remedy in this instance to
prevent any similar future Fourth Amendment violation since there was probable
cause for the tracker warrant, but it was obtained contrary to state law due to
negligence.

the good faith exception to ping orders that defendant contended were "null and void" because they were issued ultra vires where there was ample probable cause and warrants were duly issued by state judges); United States v. Lyons, Criminal No. 14-316(1) (RHK/FLN), 2015 WL 999922, at *6 (D. Minn. Mar. 6, 2015) (applying good faith exception where "issued warrant was based on boilerplate language, and [agent] forgot to change the address from a previous warrant that he had drafted," and he "testified that he was not attempting to mislead the court and he believed he could search" the location even though a different address was listed on the face of the warrant).   Therefore, if the good faith argument is reached, it is **RECOMMENDED** that Brito-Arroyo's motion to suppress the tracker warrant evidence be **DENIED** on this alternative basis.

### 2.   *Search of Jeep*

Brito-Arroyo argues that the stop of his Jeep was without probable cause. [Doc. 130 at 15-16].  He also argues that his consent to search was not voluntary.  [Id. at 16-19].

### a.   Probable Cause to Initiate the Traffic Stop

"The Fourth Amendment protects individuals from unreasonable search and seizure." United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted).  The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10

(1996) (citations omitted); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001); United States v. Edenilson-Reyes, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion in compliance with Terry v. Ohio, 392 U.S. 1 (1968). Edenilson-Reyes, 2010 WL 5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009); Purcell, 236 F.3d at 1277); see also United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999); United States v. Sierra, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011), aff'd by 501 F. App'x 900 (11th Cir. 2012) (per curiam) (unpublished). Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion. . . ."[27] Edenilson-Reyes, 2010 WL 5620439, at *9 (alterations in original) (citations and internal marks omitted); see also United States v. Boyd, 388 F. App'x

---

[27] Probable cause must be supported by more than a mere suspicion, but does not require the same "'standard of conclusiveness and probability as the facts necessary to support a conviction.'" United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003)). Reasonable suspicion is a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred. United States v. Sokolow, 490 U.S. 1, 7 (1989).

943, 947 (11th Cir. 2010) (per curiam) (unpublished); United States v. Woods, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).  The government bears the burden of presenting facts to establish that the traffic stop is supported by reasonable suspicion or probable cause.  See Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); see also United States v. Kelly, No. 1:13–cr–108–WSD–JSA, 2014 WL 1153375, at *8 (N.D. Ga. Mar. 21, 2014), adopted at *4 (citations omitted).

An officer's subjective intentions and motives are irrelevant where the officer has probable cause for the stop.  See United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted); see also United States v. Arango, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment."); Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006) (citations omitted) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed"); United States v. Jimenez, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful).  That is, "if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual."  United States v. Wright, No. CR210-022, 2010 WL 4967468, at *1 (S.D.

Ga. Nov. 5, 2010), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010) (citation omitted).  Moreover, "[t]he propriety of the traffic stop [] does not depend on whether the defendant is actually guilty of committing a traffic offense."  United States v. Sicairos-Sicairos, Criminal Action File No. 4:10–CR–054–HLM, 2011 WL 2710031, at *5 (N.D. Ga. July 11, 2011) (citation omitted).  "Instead, the relevant question is whether it was reasonable for the officer to believe that a traffic offense had been committed."  Id. (citation omitted).

Brito-Arroyo argues that the traffic stop was not supported by probable cause. [Doc. 130 at 15-16].  In particular, he asserts that Trooper Moremen "admittedly was searching for a reason to stop [him]," and that the Court should "reject the self-serving statement of a police officer who claims to have seen [him] nearly sideswipe another vehicle" since "had that happened, the dashcam video would have documented the occurrence," but the "indisputable video evidence demonstrated that there was no violation to permit the stop."  [Id. at 16 (internal marks omitted)].

Contrary to Brito-Arroyo's contention, the Court finds that Trooper Moremen had probable cause to believe that he had committed a traffic offense.  Trooper Moremen credibly testified that he observed Brito-Arroyo's Jeep fail to maintain its lane by "travel[ing] over the line maybe by a wheel width or so and then back in his lane almost sideswiping the side of [a] tractor-trailer," (Tr. 2 at 112, 163), "which is a traffic violation under O.C.G.A. § 40-6-48," United States v. Hodges, Criminal Action No. 5:07-CR-55(WDO/HL), 2007 WL 3027360, at *1 (M.D. Ga. Oct. 15, 2007); see also United States v. Salley, No. CR406-313, 2007 WL 1035133, at *2 (S.D. Ga.

Mar. 30, 2007), adopted at *1 (citation and internal marks omitted) ("Weaving without reason into nearby lanes violates O.C.G.A. § 40-6-48(1)."). Based on this uncontradicted testimony, Trooper Moremen "certainly had probable cause to stop [Brito-Arroyo because] he observed [the Jeep] cross over the . . . line" and almost hit another vehicle. United States v. Sierra, 501 F. App'x 900, 903 (11th Cir. 2012) (per curiam) (unpublished) (citations omitted) (citing United States v. Harris, 928 F.2d 1113, 1116 (11th Cir. 1991)); see also United States v. Perry, 522 F. App'x 821, 825 (11th Cir. 2013) (per curiam) (unpublished) (finding officers who witnessed defendant failing to maintain his lane while driving, in violation of Georgia law, had probable cause to believe a traffic violation had occurred); United States v. Garcia, 284 F. App'x 791, 793 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted) (noting the officer's observation of defendant "fail[ing] to maintain his lane in violation of [O.C.G.A.] § 40-6-48(1) . . . . provided [him] with probable cause for the stop").

Brito-Arroyo challenges Trooper Moremen's testimony based on the fact that the alleged traffic violation was not captured on the video recording of the traffic stop. [Doc. 130 at 16]. However, as the government points out, see [Doc. 133 at 7, 25], Trooper Moremen testified that the camera in his patrol vehicle "will rewind approximately 15 seconds and start recording from that point" once he "activates [his] blue lights," (Tr. 2 at 145-46), and in this case, he explained that after he witnessed the traffic violation, he "proceeded to catch up to the vehicle" and "called in the tag," prior to activating his emergency lights and that in "that period of time

more than 15 seconds must have elapsed," and thus, the "violation of [Brito-Arroyo]
almost sideswiping the tractor-trailer is not caught on th[e] video," (Tr. 2 at 146-47,
162-63).[28]   Trooper Moremen also testified that he "activated [his] emergency
equipment based on that violation as quickly as [he] would normally do [for] any
other traffic stop," (Tr. 2 at 147).   Brito-Arroyo has not offered any evidence that
contradicts Trooper Moremen's testimony about the operation of the dash camera,
and he has failed to show how the fact that the traffic violation was not recorded by
the dash camera in any way undermines Trooper Moremen's testimony that he
observed the Jeep travel outside of its lane, almost sideswiping a tractor trailer.

Brito-Arroyo also attempts to undermine Trooper Moremen's testimony about
observing a traffic violation by pointing out that he was "admittedly [] searching for

_____

[28] In his reply, Brito-Arroyo argues that Trooper Moremen testified that "he
had recently watched the video and that it showed a violation," but that the video
shows "there was no violation" and that the "vehicle was moving in the opposite
direction as [Trooper] Moremen said it would be moving."   [Doc. 138 at 7-8].
Because of this inconsistency between the video and Trooper Moremen's testimony,
Brito-Arroyo asserts that the Court should not believe Trooper Moremen's
testimony.   He has not cited to the testimony on which he relies, but presumably he
is referring to Trooper Moreman's testimony that "on the beginning of the
recording, you will actually see him starting to return to his lane of travel.   You will
see a slight left to right movement." (Tr. 2 at 146).   However, he stated immediately
after that the "actual violation . . . is not caught on t[he] video."  (Id.).   Whether the
video captured a "slight left to right movement" is "immaterial to whether the traffic
violation occurred," Perry, 522 F. App'x at 825, which Trooper Moremen specifically
testified was not caught on video, (Tr. 2 at 146).   Trooper Moremen "did not testify
so inconsistently," that his "testimony that [he] had witnessed the [] traffic violation
was unbelievable," and the undersigned "conclude[s] that [Brito-Arroyo] has not
shown that [Trooper Moremen's] testimony concerning observing [Brito-Arroyo]
commit . . . the [] traffic violation[] was unbelievable." Perry, 522 F. App'x at 825.

a reason to stop [Brito-Arroyo]." [Doc. 130 at 16 (citation omitted)]. However, Brito-Arroyo's argument is unavailing because, as previously stated, an officer's subjective intentions and opinions are irrelevant where the officer has probable cause for the stop. See Mwangi, 2010 WL 520793, at *3 n.9 (citations omitted); see also Arango, 396 F. App'x at 632-33 (citation omitted). "Having probable cause to stop [Brito-Arroyo] for a traffic offense, it was irrelevant that [Trooper Moremen] was primarily looking to stop the vehicle based on [the agents'] instruction." United States v. Reyes, Criminal Case Nos. 1:11–cr–00009–ODE–RGV, 1:11–cr–00060–ODE–RGV, 2011 WL 7070980, at *6 (N.D. Ga. Aug. 29, 2011), adopted by 2012 WL 176488, at *1 (N.D. Ga. Jan. 19, 2012). Thus, Brito-Arroyo has not identified any valid basis to question Trooper Moremen's testimony that he observed Brito-Arroyo's Jeep fail to maintain its lane.

In short, Trooper Moremen's testimony established that he had probable cause to believe that Brito-Arroyo had violated state law, which is "all that is necessary to conduct a traffic stop." United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *5 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 5262735, at *1 (M.D. Fla. Dec. 17, 2010) (citing Whren, 517 U.S. at 810). Having considered the evidence and testimony presented at the evidentiary hearing, the Court finds Trooper Moremen provided credible testimony that he observed the Jeep fail to maintain its line and almost strike another vehicle. See United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are

"within the province of the factfinder").  Therefore, Trooper Moremen had probable cause to stop Brito-Arroyo for the observed traffic violation.

### b.    Consent to Search

Brito-Arroyo also argues that he did not voluntarily consent to the search of his vehicle.  [Doc. 130 at 16-19; Doc. 77].  In particular, he asserts that his consent was coerced because he was ordered to exit the Jeep and then patted down, his cellular phones were taken and placed on the hood of the patrol vehicle, and there were three armed officers present.  [Doc. 130 at 18].  The government responds that the "conditions of which [Brito-Arroyo] complains do not render his consent involuntary."  [Doc. 133 at 25].

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971); Katz v. United States, 389 U.S. 347, 357 (1967)).  "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."  United States v. Garcia,  890 F.2d 355, 360 (11th Cir. 1989). "An officer conducting a routine traffic stop may request consent to search the

vehicle." United States v. Harris, 526 F.3d 1334, 1339 (11th Cir. 2008) (per curiam) (citation and internal marks omitted).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360. "[T]he principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession– i.e. whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances." United States v. Boskic, Criminal No. 04-10298-DPW, 2006 WL 1540488, at *19 (D. Mass. June 2, 2006), aff'd, 545 F.3d 69 (1st Cir. 2008) (citation and internal marks omitted); see also United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995) (noting voluntariness of consent is judged in light of the totality of the circumstances). Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. Purcell, 236 F.3d at 1281; see also United States v. Chaidez-Reyes, Criminal Action No. 1:13-CR-158-ODE-AJB, 2014 WL 547178, at *15 (N.D. Ga. Feb. 10, 2014), adopted at *1. Ultimately, the burden is on the government to prove that the consent was given voluntarily. United States v. Bentley, 151 F. App'x 824, 827 (11th Cir. 2005) (per curiam) (unpublished) (quoting United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984)); Tovar-Rico, 61 F.3d at 1536 (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)); United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).

"The [g]overnment has met its burden of demonstrating that [Brito-Arroyo] voluntarily consented to the search of his vehicle." United States v. Gibbs, CRIMINAL INDICTMENT NO.: 2:17-CR-00005-RWS-JCF, 2018 WL 1916627, at *4 (N.D. Ga. Mar. 14, 2018), adopted by 2018 WL 1915080, at *1 (N.D. Ga. Apr. 23, 2018). Trooper Moremen testified that Brito-Arroyo voluntarily consented to the search of his vehicle in writing. (Tr. 2 at 120-22). Trooper Moremen's testimony was consistent with the video recording of the traffic stop, which shows that he asked if Brito-Arroyo could read English or Spanish better, and after Brito-Arroyo responded that he could read Spanish better, Trooper Moremen printed a GSP consent-to-search form in Spanish, confirmed with Brito-Arroyo that he could read Spanish better, presented him with the form, and instructed him to read it and sign it if he agreed to it. See (Tr. 3, Gov't Ex. 4). Trooper Moremen then stepped away from Brito-Arroyo, and Brito-Arroyo appeared to review the form and signed it. (Id.); see also (Tr. 2, Gov. Exs. 6 & 6A). The video also shows that Trooper Moremen used a casual, conversational tone, did not draw his weapon, did not use physical force or restrain Brito-Arroyo at that time, and had not threatened him in any way, but simply provided a consent-to-search form in Spanish, which Brito-Arroyo signed, consenting in writing to the search of his Jeep. See (Tr. 3, Gov't Ex. 4); see also United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) (alterations in original) (citation omitted) ("'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.'").

56

Contrary to Brito-Arroyo's contention, his consent was not rendered involuntary because he was asked to exit his vehicle and then patted down, his cellular phones were taken and placed on the hood of the patrol vehicle, and there were three armed officers present. See Perry, 522 F. App'x at 826 (citation omitted) ("determining that consent to search vehicle was voluntary when an officer possessed defendant's license, but did not threaten violence or suggest that the defendant could not refuse"); Spoerke, 568 F.3d at 1248 (citations and internal marks omitted) ("During a lawful traffic stop, officers [] may take steps that are reasonably necessary to protect their personal safety, including requiring the driver and passengers to exit the vehicle as a matter of course."); United States v. Acosta, 807 F. Supp. 2d 1154, 1179 (N.D. Ga. 2011), adopted at 1168 (citation omitted) (noting the Eleventh Circuit has "found voluntary a consent to search which was given after the defendant was arrested by numerous officers, patted down for weapons and a protective sweep of his house was conducted and after he was seated in his living room in handcuffs, given his *Miranda* rights, and the officers had refused to accept a limited consent"); Edenilson-Reyes, 2010 WL 5620439, at *14 (finding presence of three officers did not render consent involuntary); United States v. Jackson, 548 F. Supp. 2d 1314, 1323 (M.D. Fla. 2008), adopted at 1316 (second alteration in original) (citations omitted) ("[T]he mere fact that Sergeant Weeks held Defendant's license and the vehicle registration 'does not vitiate [Defendant's] consent."); see also United States v. Barnum, 564 F.3d 964, 970 (8th Cir. 2009) (citations omitted) ("[T]he mere presence of 'two to three officers being armed with holstered firearms,' in the

absence of evidence of threats or intimidation, does not negate a defendant's consent."). "Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that [Brito-Arroyo] freely and voluntarily consented to a search of the [vehicle]." United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1338 (N.D. Ga. 2009), adopted at 1326 (citations omitted); see also United States v. Brown, 223 F. App'x 875, 880 (11th Cir. 2007) (per curiam) (unpublished) (finding consent to search voluntary despite the fact that officer had drawn his weapon and placed defendant in handcuffs); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993) (finding consent voluntary where defendant was arrested by law enforcement who had broken into his home early in the morning, woke him up, and forced him to the ground at gun point); Garcia, 890 F.2d at 361 (holding consent voluntary where defendant was arrested by numerous officers, was patted down for weapons, was handcuffed, and where the officers refused to accept defendant's conditional consent to search and threatened to obtain a search warrant if he did not consent to a full search).[29]  Accordingly, because the

---

[29] To the extent Brito-Arroyo argues that his consent to search the Jeep did not include consent to search his wife's purse, the government correctly notes that "he has not demonstrated standing to contest the search of his wife's purse."  [Doc. 133 at 29 n.3]; see also United States v. Serrano, 695 F. App'x 20, 23 (2d Cir. 2017) (unpublished) ("[Defendant] failed to demonstrate that *his rights* were violated by the search of the handbag."); United States v. Jackson, 15 F.3d 1160 (D.C. Cir. 1994) (per curiam) (unpublished) (noting that defendant "introduced no evidence indicating ownership or possession of the purse" and the fact that it was his wife's purse was "inadequate to establish a reasonable expectation of privacy in the

undersigned finds that the traffic stop and subsequent search of Brito-Arroyo's vehicle did not violate the Fourth Amendment, it is **RECOMMENDED** that his motion to suppress evidence obtained as a result of this search be **DENIED**.

### 3.   *Search of Cellular Phones*

Brito-Arroyo argues that SA Ledgerwood "conducted a warrantless search of [his] phones[.]"  [Doc. 130 at 19].  The government asserts that SA Ledgerwood accessed one of Brito-Arroyo's phones during the traffic stop for the "limited purpose of disabling security features and placing it in airplane mode," and that "the Supreme Court has recognized the need to make limited intrusions on digital devices to prevent them from being encrypted or remotely erased to destroy evidence."  [Doc. 133 at 30 (citing Riley v. California, 573 U.S. 373, 390-91 (2014))]. The government also argues that "even if SA Ledgerwood's actions in disabling security features were improper," the Court should only suppress "evidence obtained from one of three sources–the internal memory of [Brito-Arroyo's] 'smart' phone" since "CFA Lehman[n] testified that the 'dumb' phone and SD card seized from [Brito-Arroyo] did not have encryption capabilities, and thus could have been searched even if [SA] Ledgerwood had not initially accessed the devices." [Id.]. The government thus contends that "[b]ecause evidence acquired from the dumb phone and SD card was independently obtained pursuant to the warrant, and that

---

purse"); United States v. Kelly, 46 F. Supp. 2d 624, 627 (E.D. Tex. 1999) (finding defendant "has no expectation of privacy in [another's] purse, and therefore, ha[d] no standing to contest the search").

acquisition was not the result of the earlier warrantless entry into the device[], such evidence should not be excluded[.]" [Id. (citation omitted)].[30]

"A defendant who claims his rights under the Fourth Amendment to the United States Constitution were violated has the initial burden to show that a warrantless search or seizure occurred." United States v. Williams, No. 1:14-cr-321-WSD, 2015 WL 4477785, at *4 (N.D. Ga. July 21, 2015) (citing United States v. Bachner, 706 F.2d 1121, 1125–26 (11th Cir.1983)); see also United States v. Alexander, No. CR 113-007, 2013 WL 6577297, at *6 (S.D. Ga. Dec. 13, 2013), adopted at *4 (citations omitted) ("A defendant seeking the suppression of evidence bears the initial burden of showing that he was subjected to an unlawful search or seizure and that the evidence in question should be suppressed[.]").  While Brito-Arroyo asserts that SA Ledgerwood searched his phones during the traffic stop, the evidence presented at the hearing does not establish that he actually searched the phones. The dashcam video shows SA Ledgerwood handling the phones, but it does not reveal what he did with the phones. See (Tr. 3, Gov't Ex. 4).  The government asserts that SA Ledgerwood entered one of Brito-Arroyo's phones solely for the purpose of disabling the security features and placing it in airplane mode, but the evidence does not support this contention either, despite the government's argument to the

---

[30] In order "to determine whether the evidence is admissible under the independent source doctrine, this Court must [] closely examine the warrant," United States v. Gonzalez De Arias, 510 F. Supp. 2d 969, 976 (M.D. Fla. 2007), but the government has not submitted the warrant to search Brito-Arroyo's cell phones for the Court's review, nor identified where it may be found in the Court's files.  Thus, the Court is unable to consider the government's alternative argument.

contrary. [Doc. 133 at 9-10, 29]. Instead, SA Ledgerwood was unable to testify with certainty as to what he did with the phones when he handled them at the traffic stop. He acknowledged that the video recording of the traffic stop shows him picking up one of the phones and taking notes and then picking up the second phone, (Tr. 2 at 184), but he testified that he had no "independent recollection of [] what [he] did with those phones," and he could not say under oath exactly what he was doing with the phones as depicted in the video, (Tr. 2 at 192). He testified that he was probably asking Brito-Arroyo for his pass code because his phone was locked and putting it in airplane mode as that is what he typically did, but he could not "say [with] one hundred percent certainty" that was what he was doing. (Tr. 2 at 192-93). In addition, he did not recall whether he had looked through the phones for evidence prior to obtaining the search warrant. (Tr. 2 at 194). The parties stipulated that SA Ledgerwood obtained the pass code for Brito-Arroyo's phone from him at the scene of the stop as reflected in notes he wrote on the hood of the patrol vehicle as depicted in the video recording,[31] (Tr. 3 at 24), but there is no evidence that he searched the phones.

Absent evidence that SA Ledgerwood conducted a warrantless search of the phones, Brito-Arroyo has failed to satisfy his initial burden of showing that a search was conducted in violation of the Fourth Amendment. See Williams, 2015 WL 4477785, at *4; see also United States v. Boudreau, CR No. 16-011-M, 2017 WL

---

[31] Brito-Arroyo has not moved to suppress statements he made during the traffic stop or following his arrest.

3208469, at *2 (D.R.I. July 27, 2017) (finding that defendant's motion to suppress warrantless search of cell phone suffered "a fatal factual flaw" in that "no warrantless search of [defendant's] cell phone occurred, or at least nothing in the record [gave] the Court cause to believe that one occurred").  Moreover, Brito-Arroyo has not identified any evidence to be suppressed from SA Ledgerwood's alleged warrantless search of the phones, see Hardy v. United States, Nos. 1:08–CV–90027 WLS, 1:05–CR–22 WLS, 2008 WL 8126040, at *3 (M.D. Ga. Oct. 14, 2008), adopted by 2010 WL 4260212, at *1 (M.D. Ga. Oct. 21, 2010) (citation omitted) (Even "[a]ssuming *arguendo* that there was an illegal search . . ., nothing was seized which could have constituted 'fruit of the poisonous tree' to be suppressed[.]"), nor has he challenged the search warrants subsequently obtained for the phones or the search of the phones performed by CFA Lehmann pursuant to the warrant, see United States v. Broxmeyer, 08-CR-21, 2008 WL 11422677, at *1 n.1 (N.D.N.Y. Aug. 28, 2008) (denying motion to suppress the seizure and search of cell phone where "cell phone was lawfully seized incident to arrest and as part of law enforcement's inventory responsibilities, and [] the evidence demonstrated that the contents of the cell phone were not searched until after a warrant was obtained authorizing a search of its contents").  Accordingly, it is **RECOMMENDED** that Brito-Arroyo's motion to suppress evidence obtained from his cell phones be **DENIED**.

**4.    Search of 1319 Zachary Way**

Brito-Arroyo and Brito-Maldonado move to suppress evidence obtained from the search of 1319 Zachary Way.  See [Doc. 130 at 2 n.1, 19-21]; see also [Docs. 64 &

77].  In particular, they argue that the consents to enter and subsequently search the residence were invalid, and even if valid, agents exceeded the scope of those consents.  [Doc. 130 at 19-21].  In response, the government contends that Brito-Arroyo cannot establish standing to challenge the search based only on his leasehold interest.  [Doc. 133 at 31-33].[32]  The government also contends that agents conducted a valid security sweep of the home pursuant to verbal consent, [id. at 34-37], and that agents then conducted a valid search of the property pursuant to written consents, [id. at 37-40].

### a.   Standing

"To determine whether an individual may challenge a search, the court must decide 'whether the individual maintains a legitimate expectation of privacy in the object of the search.'"   United States v. Elkins, CRIMINAL CASE NO. 1:16-CR-002406-ELR-JFK, 2017 WL 2457494, at *4 (N.D. Ga. Apr. 13, 2017), adopted by 2017 WL 2457153, at *1 (N.D. Ga. June 6, 2017) (quoting United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989)).  "It is [Brito-Arroyo's] burden to prove that he has a legitimate expectation of privacy in the [residence]."   Id. (citation omitted).  "Making this determination involves a two-part inquiry: (1) whether the individual has manifested a subjective expectation of privacy in the object of the challenged search[,] . . . [and (2) ] whether society is willing to recognize the individual's

---

[32] The government does not challenge the right of Brito-Maldonado to contest the search of 1319 Zachary Way, see [Doc. 133], and thus, "the Court finds that [he] will be permitted to challenge [this] search[]," United States v. Evans, No. 3:05 CR 159 J 32HTS, 2006 WL 2221629, at *7 (M.D. Fla. Aug. 2, 2006), adopted at *2.

expectation of privacy as legitimate." United States v. Vega-Cervantes, No. 1:14-cr-234-WSD, 2015 WL 4877657, at *24 (N.D. Ga. Aug. 13, 2015) (alterations in original) (internal marks omitted) (citing Hastamorir, 881 F.2d at 1559). "In this regard, [t]he Supreme Court has held that [a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Id. (alterations in original) (citation and internal marks omitted).

"[P]roperty ownership or residence will not automatically establish a legitimate expectation of privacy in a premises, but are factors to be considered." Evans, 2006 WL 2221629, at *6 (citations omitted) (citing United States v. Salvucci, 448 U.S. 83, 91 (1980)); see also Salvucci, 448 U.S. at 91 (citation omitted) ("While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of this Court's inquiry."); United States v. Dyar, 574 F.2d 1385, 1390 (5th Cir. 1978)[33] ("Traditional or common law theories of property rights do not automatically confer standing to challenge a search."). "Property rights in absence of reasonable expectations of privacy in property cannot support a Fourth Amendment claim." Dyar, 574 F.2d at 1390 (citation omitted).

---

[33] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Thus, "[o]wnership or a leasehold interest must be accompanied by a cognizable privacy interest in the place or thing searched." Id. (citations omitted).

"The Eleventh Circuit has recognized a number of factors that are relevant to the determination of whether a defendant has a legitimate expectation of privacy in a premises." Evans, 2006 WL 2221629, at *6 (citation omitted) (citing United States v. Brown, 743 F.2d 1505, 1507 (11th Cir. 1984) (per curiam)). "[T]he right to exclude others is one important factor." Id. (citation omitted). "Other factors to be considered when determining whether a defendant can assert a Fourth Amendment challenge include":

> (1) whether the defendant has a possessory interest in the thing seized or the place searched; (2) whether the defendant has exhibited a subjective expectation that the property would remain free from governmental invasion; (3) whether the defendant took normal precautions to maintain his . . . privacy; and (4) whether the defendant was legitimately on the premises.

Id. (alterations, citations, and internal marks omitted).

While Brito-Arroyo has presented a lease, showing he, along with Brito-Maldonado, leased the residence for the period between September 1, 2016, and September 1, 2018, see (Tr. 2, Def. Ex. 1), his leasehold alone is insufficient to establish a legitimate expectation of privacy in the residence located on Zachary Way. "[N]o evidence was presented to support a finding that [Brito-Arroyo] resided at the [r]esidence [at the time of the search] or that he had the right to exclude others from [] the residence." Evans, 2006 WL 2221629, at *8. "In fact, there is no evidence that [Brito-Arroyo] himself even had a key to the [r]esidence," id., and law

65

enforcement found no items during the search that appeared to belong to him, (Tr. 2 at 96). The evidence before the Court is that, while Brito-Arroyo had access to the video monitoring system on his phone, he had not lived at Zachary Way since May of 2017, (Tr. 1 at 191-92; Tr. 2 at 88, 92), and that Brito-Maldonado resided at Zachary Way, along with three other occupants: his mother and his aunt, Ms. Arroyo, and her minor son, and that no one other than those residing there had a key to Zachary Way, (Tr. 1 at 21-24). Based upon the record evidence, "the undersigned concludes that [Brito-Arroyo] has failed to carry [his] burden" to demonstrate a legitimate expectation of privacy in the residence located on Zachary Way. See Evans, 2006 WL 2221629, at 10; see also Bonds v. Cox, 20 F.3d 697, 701 (6th Cir. 1994) (finding defendant "failed to manifest a subjective expectation of privacy" in the home she owned because the evidence showed she "was not occupying the house during the relevant time period" and that she allowed someone else to live there); United States v. Rios, 611 F.2d 1335, 1345 (10th Cir. 1979) (concluding that defendant had no reasonable expectation of privacy in mobile home, despite his claim to ownership, since he did not actively occupy the home nor did he take "normal precautions to maintain his privacy that is, precautions customarily taken by those seeking privacy" or "use[] the mobile home in such a way as to raise a legitimate expectation of privacy"); United States v. Best, 255 F. Supp. 2d 905, 912 (N.D. Ind. 2003) (finding facts "insufficient to establish a legitimate expectation of privacy" where defendant was not living at property he leased, someone else had a key, at least one person who did not have a key had access, and he never claimed ownership of any of the

66

seized items).  Accordingly, because the search of Zachary Way did not violate Brito-Arroyo's Fourth Amendment rights as he did not have a legitimate expectation of privacy, it is **RECOMMENDED** that his motion to suppress evidence obtained from this search be **DENIED**.[34]

### b.    Consent to Search

Brito-Maldonado argues that Ms. Arroyo's consent was involuntary, and even if voluntary, the scope of her consent was exceeded, [Doc. 130 at 19-21; Doc. 139 at 2-7], and that he was thereafter "pressured to sign waivers after the search and seizure had occurred," [Doc. 64 at 4].  The government contends that agents conducted a valid security sweep pursuant to Ms. Arroyo's verbal consent and that after completing the security sweep, the agents obtained written consent from both Ms. Arroyo and Brito-Maldonado to search the residence.  [Doc. 133 at 34-40].

The Court finds that the initial search of the residence was lawful pursuant to Ms. Arroyo's verbal consent and the subsequent search was lawful pursuant to Ms. Arroyo and Brito-Maldonado's written consents.  As previously noted, "'[o]ne of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent,'" United States v. Sharp, Civil Action File No. 1:14-cr-227-TCB, 2015 WL 4644348, at *4 (N.D. Ga. Aug. 4, 2015), adopted at *1 (citations omitted), and "[i]n order for consent to a search to

---

[34] Even if Brito-Arroyo had established a legitimate expectation of privacy in the residence, his motion to suppress would still fail for the same reasons stated hereinafter with respect to Brito-Maldonado's motion.

be deemed voluntary, it must be the product of an essentially free and unconstrained choice," Garcia, 890 F.2d at 360. "[V]oluntariness of consent is determined on the basis of the totality of the circumstances." Sharp, 2015 WL 4644348, at *4.

After careful consideration of the testimony and evidence presented at the evidentiary hearing, the Court finds that Ms. Arroyo voluntarily consented to the protective sweep and that she and Brito-Maldonado subsequently consented in writing to a search of the residence. Following the traffic stop of the Jeep, SA Ledgerwood traveled to Zachary Way to conduct a "knock-and-talk" and approached the front door dressed in plainclothes and accompanied by two uniformed Troopers and TFO Schweizer, who also was dressed in plainclothes. (Tr. 1 at 40-42). SA Ledgerwood knocked on the door and Ms. Arroyo answered the door shortly thereafter. (Tr. 1 at 45-46, 121). After displaying his badge and credentials, SA Ledgerwood, who is proficient in Spanish, conversed with Ms. Arroyo in Spanish in "a normal tone." (Tr. 1 at 38-39, 46-47, 108-09, 122-23). SA Ledgerwood told her that they had "stopped [her] son out on the road" and asked whether anyone else was home, and Ms. Arroyo denied that anyone else was there. (Tr. 1 at 47-48). Because SA Ledgerwood had been advised that there were two adult males present at the residence, (Tr. 1 at 43-44, 89, 135-36), Ms. Arroyo's denial raised his suspicion, (Tr. 1 at 48), and he asked to check the residence for people, so they could safely continue their conversation, (Tr. 1 at 48-49, 102), and she said, "Yes, that's okay," (Tr. 1 at 48). SA Ledgerwood also asked if she knew of "any

drugs or weapons here at the house," (id.), and she responded, "No," (id.).  SA Ledgerwood's weapon was not drawn while he was obtaining Ms. Arroyo's consent. (Tr. 1 at 128).

SA Ledgerwood, along with approximately five other law enforcement personnel, entered the residence and conducted a sweep with their weapons drawn, only "looking in areas where [they] could find a person."  (Tr. 1 at 49-51).  After finding no adult males in the residence, SA Ledgerwood and Trooper Allen proceeded to the backyard toward a shed that was within the privacy fence.  (Tr. 1 at 53).  As they approached the shed, they heard music, and upon opening the shed door, found the two males, Arroyo-Garcia and Brito-Maldonado, and a methamphetamine lab.  (Tr. 1 at 53-54).  After the two were secured in handcuffs, SA Ledgerwood decided to "get a written consent for the address, and so [he] got some forms."  (Tr. 1 at 59).  SA Ledgerwood sat at the dining room table with Ms. Arroyo, presented her with the HSI consent-to-search form, written in both Spanish and English, and "read the form line by line [in Spanish]."  (Tr. 1 at 60-62).  Specifically, the form stated that "Special Agents of the United States Department of Homeland Security have asked for my permission to carry out a complete search of" 1319 Zachary Way, that "I have been informed that I have the right to refuse to give my consent," and "I give this permission voluntarily."   (Tr. 1, Gov't Ex. 1). "[A]fterwards [SA Ledgerwood] asked her if she understood, and she said she did," and she signed the form.  (Tr. 1 at 60-62; Tr. 1, Gov't Ex. 1).  SA Ledgerwood testified that he spoke with Ms. Arroyo in a "normal conversational" tone, that he did not

threaten her or make any sort of promises to get to her to sign the form, and that he never came into physical contact with her at all.  (Tr. 1 at 63, 127).  Since Ms. Arroyo told him that Brito-Maldonado also lived at Zachary Way, SA Ledgerwood "did the same thing with him," and presented him with an identical form, "explained the form [in Spanish], read it line by line and said do you understand, and [Brito-Maldonado] said he did, and he signed the form."  (Tr. 1 at 60, 63-65; Tr. 1, Gov't Ex. 2).  SA Ledgerwood testified that he similarly spoke to Brito-Maldonado in a "conversational, normal tone," and that he did not threaten him or make any promises.  (Tr. 1 at 65-66).  "All the weapons were put up by" the time these forms were signed, (Tr. 1 at 69, 128-29), and there is no evidence that any law enforcement agent threatened, made promises to, or coerced either Ms. Arroyo or Brito-Maldonado to obtain their consent.  (Tr. 1 at 68-70, 126-130, 137-40); see also Zapata, 180 F.3d at 1242 (alterations in original) (citation omitted) ("'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.'").

Brito-Maldonado argues that Ms. Arroyo "cannot read or write in either Spanish or English."  [Doc. 139 at 4 (citation omitted)].  He thus asserts that her education and intelligence, "coupled with the fact that at no time was she told she had the right to refuse entry, . . . makes clear her consent was not voluntary."  [Id. at 5].  The Court disagrees.  See Tukes v. Dugger, 911 F.2d 508, 517 (11th Cir. 1990) (finding consent voluntary despite defendant's "education and intelligence were

low, and the police had an inkling of [his] limitations when he informed them that he could not read or write" and that he was not informed of "his right to consent"). First, voluntariness does not "require[] proof of knowledge of a right to refuse as the sine qua non of an effective consent to a search."  Schneckloth, 412 U.S. at 234. Nevertheless, it is apparent that Ms. Arroyo was aware of her right to refuse.  While she was not told that she had the right to refuse at the time of her verbal consent, Ms. Arroyo specifically testified that she knew she "had the right to tell him no," but she just "got scared," (Tr. 1 at 184), and prior to providing written consent to search, SA Ledgerwood read her each line of the consent form, one of which stated that she had "been informed that [she has] the right to refuse to give [her] consent," (Tr. 1 at 60-62; Tr. 1, Gov't Ex. 1); see also Bentley, 151 F. App'x at 828 (noting that the "government was not required to prove that the suspect was aware of the right to refuse to consent," but finding defendant was "most likely aware of his right to refuse consent to search").  With regard to her education and intelligence, although Ms. Arroyo testified that she "didn't go to school" and could not read either Spanish or English, (Tr. 1 at 164), she verbally agreed to a search for persons and then she was not asked to read the consent form herself, but SA Ledgerwood instead explained the form and read it line by line to her in Spanish, (Tr. 1 at 48, 60-62), and she said she understood and signed her name, (Tr. 1 at 60-62; Tr. 1, Gov't Ex. 1); see also Ortega v. Madden, Case No. 1:16-cv-00235-DAD-EPG-HC, 2016 WL 6599794, at *15 (E.D. Cal. Nov. 8, 2016) (noting that defendant's literacy had little to do with

the issue before the court because his rights were explained to him orally, he spoke Spanish, and he nodded after being asked if he understood).[35]

In addition, Brito-Maldonado contends that he was pressured to sign the consent-to-search form after the search and after he had already been seized, [Doc. 64 at 4], but his arguments are unpersuasive.  The agents initially searched the residence for persons pursuant to Ms. Arroyo's verbal consent and then conducted a more thorough search after first obtaining Brito-Maldonado's written consent.  See United States v. Unpradit, Criminal No. 17-107(4) (DWF/TNL), 2018 WL 3377177, at *2 (D. Minn. July 11, 2018) ("The voluntary consent given by Defendant's roommate was sufficient to allow law enforcement to search the apartment.").  Although Brito-Maldonado "was in custody at the time of his arrest, that fact does not vitiate his ability to voluntarily consent."  United States v. Salgado, Criminal Action File No. 1:10-CR-251-TWT-AJB-08, 2012 WL 1080146, at *8 (N.D. Ga. Mar. 12, 2012), adopted by 2012 WL 1079957, at *1 (N.D. Ga. Mar. 30, 2012) (citation omitted).

---

[35] It is also argued that Ms. Arroyo's consent was not voluntary because SA Ledgerwood told her about her son being arrested and because of her other "past experiences," including that her "four brothers were shot and killed when Mexican police arrived at her door and asked permission to enter."  [Doc. 130 at 19; Doc. 139 at 4-5].  These circumstances, however, do not render her consent involuntary.  See United States v. Freyre-Lazaro, 3 F.3d 1496, 1501 (11th Cir. 1993) (finding mother voluntarily consented to search of her house even though she had "witnessed the arrest of her son outside her home" and was "upset over her son's arrest"); United States v. Hunter, Criminal Case No. 1:14-CR-00089-AT, 2015 WL 509995, at *9 (N.D. Ga. Feb. 6, 2015), adopted at *2 (second alteration in original) (finding consent voluntary  "notwithstanding [defendant's] 'impression that [he] could not refuse' the search," which was "based on his prior experience" with law enforcement).

And, "the Court [] rejects[] as not credible [his] claims that his [consent] was [pressured]." Id. "The question is whether the officers used coercive tactics or took unlawful advantage of the [] situation to obtain the consent," and the evidence detailed above "requires that inquiry to be answered 'no.'" Id. (citation omitted).

"Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that [Ms. Arroyo and Brito-Maldonado] freely and voluntarily consented to a search of [1319 Zachary Way]." Rodriguez-Alejandro, 664 F. Supp. 2d at 1338 (citations omitted); see also United States v. Alim, 256 F. App'x 236, 240 (11th Cir. 2007) (per curiam) (unpublished) (finding consent voluntary where more than fourteen officers were present during the search); Brown, 223 F. App'x at 880 (finding consent to search voluntary despite the fact that officer had drawn his weapon and placed defendant in handcuffs); Hidalgo, 7 F.3d at 1567, 1571 (finding consent voluntary where defendant was arrested by law enforcement who had broken into his home early in the morning, woke him up, and forced him to the ground at gun point); Garcia, 890 F.2d at 361 (holding consent voluntary where defendant was arrested by numerous officers, was patted down for weapons, was handcuffed, and where the officers refused to accept defendant's conditional consent to search and threatened to obtain a search warrant if he did not consent to a full search).

### c.   Scope of Consent

"A search is impermissible when an officer does not conform to the limitations imposed by the person giving consent." Salgado, 2012 WL 1080146, at *7 (citations omitted); see also United States v. Watkins, 760 F.3d 1271, 1279 (11th Cir. 2014) (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)) ("[T]he scope of a search based on consent may not exceed the scope of the given consent.").  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251 (citations omitted).

Brito-Maldonado argues that SA Ledgerwood exceeded the scope of Ms. Arroyo's initial consent to enter the residence by allowing more officers to conduct the safety sweep than were visible at the time she consented.  [Doc. 130 at 2 n.1, 20]. As the government correctly contends, [Doc. 133 at 37], this argument is without merit.  SA Ledgerwood asked if it was okay if they "looked for people," so they could safely continue their conversation, (Tr. 1 at 48-49, 102), and Ms. Arroyo responded, "Yes, that's okay," (Tr. 1 at 48). SA Ledgerwood did not qualify that the search would be conducted by a certain numbers of agents, nor did Ms. Arroyo limit her consent in any way.  See United States v. Thornton, Criminal Case No. 1:10-CR-0453-ODE-JFK, 2011 WL 6217080, at *9 (N.D. Ga. July 28, 2011), adopted by 2011 WL 6257082, at *4 (N.D. Ga. Dec. 13, 2011) (citation and internal marks omitted) ("Nothing that [d]efendant said or did at the time of the entry alerted the agents to

any such restriction on the scope of the search," and "[i]t is the defendant's responsibility to limit the scope of the search if he so intends.").  Moreover, once Ms. Arroyo saw the number of agents that entered the residence to conduct the search, she did not attempt to either limit or revoke her consent at that time.  "From this it can be inferred that the aid given [SA Ledgerwood] by the additional agents was within the scope of [Ms. Arroyo's] consent."  United States v. Mendez, 431 F.3d 420, 427 (5th Cir. 2005).  And, in light of the knowledge that there were others present in the residence, (Tr. 1 at 43-44, 89, 135-36), "[i]t is eminently reasonable that several agents would be sent into the house to search for additional people," Mendez, 431 F.3d at 427.[36]  Thus, the Court concludes that the search of 1319 Zachary Way was pursuant to voluntary consent and that they agents did not exceed the scope of the consent given.  Accordingly, it is **RECOMMENDED** that the motion to suppress the evidence obtained as a result of this search be **DENIED**.

---

[36] Brito-Maldonado's attempt to distinguish Mendez from the facts of this case is unpersuasive.  See [Doc. 130 at 21].  Also, to the extent Brito-Maldonado contends that Ms. Arroyo's consent was exceeded when the agents searched the shed in the backyard, [Doc. 139 at 4], this argument similarly is without merit.  As the government points out, Ms. Arroyo "did not qualify that the search would be limited to certain parts of the residence, nor was [her] permission to search limited in any way," and "law enforcement reasonably understood [her] consent to extend to the entirety of the residential property, that is, the house along with its regular neighborhood-sized backyard and the small shed therein–all of which was contained within a privacy fence."  [Doc. 133 at 36]; see also United States v. Beltran, No. CR. 02-20100-GV, 2002 WL 1968167, at *6 (W.D. Tenn. Aug. 21, 2002) (finding officers did not exceed the scope of consent given for only searching "for other people within the house," where they only looked in areas where a person could have been hiding, which included the backyard and attic, among other places).

5.      *Search of Mosaic Apartment*

Brito-Arroyo argues that his wife's alleged consent to search their apartment "should be found to have been coerced" since she "was placed in handcuffs at approximately 6 p.m." [Doc. 130 at 21 (citations omitted)]. He also argues that her consent "is a plain fabrication" as it was "purportedly signed at 4:15," which "is impossible" since she could not "have signed the consent form four hours prior to being returned to her home and prior to the stop of the Jeep in which she was a passenger." [Id. at 22]; see also [Doc. 130-1 at 2]. Brito-Arroyo contends that evidence obtained from the search of his residence should be suppressed for these reasons. [Doc. 130 at 22]. In response, the government argues that Ms. Brito-Arroyo validly consented in writing to the search of the apartment and that the fact that she "had been handcuffed some three hours prior does not even come close to vitiating an otherwise valid consent." [Doc. 133 at 40-41]. The government also argues that the "original Spanish-language consent form reflects that it was signed at '9:15 [p.m.]'–albeit in poor handwriting–after the traffic stop and consistent with when agents would have requested consent after arriving at the Mosaic Apartment." [Id. at 40 (alteration in original) (citing (Tr. 2, Gov't Ex. 7))]. Brito-Arroyo does not address either of the government's arguments in his reply brief. In fact, he does not even discuss the search of the Mosaic Apartment, see [Doc. 138], nor does he include this search in his list of alleged "[c]onstitutional [v]iolations," [id. at 10].

As previously noted, "voluntariness of consent is determined on the basis of the totality of the circumstances," relevant factors of which include "the presence of

coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found." United States v. Weeks, 666 F. Supp. 2d 1354, 1374 (N.D. Ga. 2009), adopted at 1358 (citations omitted).  After Mrs. Brito-Arroyo was transported to the Mosaic Apartment, TFO Petron, who is fluent in Spanish, confirmed that Mrs. Brito-Arroyo could read and understand Spanish and presented her with a consent-to-search form, which TFO Petron allowed her to read, and Mrs. Brito-Arroyo then signed the form, consenting to the search of the apartment.  (Tr. 2 at 205-08; Tr. 2, Gov't Ex. 7); see also [Doc. 130-1 at 1-2].  When Mrs. Brito-Arroyo signed the form, only TFOs Petron and Alvarez and SA Cadwalader were in her vicinity, while the remaining law enforcement officers "were across [] the parking lot."  (Tr. 2 at 207-09).  In granting consent, she signed below the following statement: "I allow the ICE Special Agents; of my own free will and intentionally, to [perform] complete search of my property.  My consent has [] been given voluntarily and without being subjected to threats, promises, pressure or coercion of any kind.  I've read the aforementioned statement and understand my rights." [Doc. 130-1 at 2 (emphasis omitted) (English translation)]; see also (Tr. 2, Gov't Ex. 7).  TFO Petron testified that neither he nor TFO Alvarez or SA Cadwalader were in uniform and their firearms were concealed at the time Mrs. Brito-Arroyo consented to the search; that he did not see any member of law enforcement interact with Mrs. Brito-Arroyo in a way that was not appropriate; and that after the apartment "was cleared just prior to actual searching,

she was [] brought inside the apartment where she was in the family room area sitting on the sofa so she could at any time tell [the agents] to stop the search if she felt that she needed to."  (Tr. 2 at 208, 210-11); see also Zapata, 180 F.3d at 1242 (alterations in original) (citation omitted) ("'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.'").

And, despite Brito-Arroyo's argument to the contrary, the fact that his wife was placed in handcuffs during the traffic stop several hours prior to giving consent to search the apartment does not render her consent involuntary.  See United States v. Scott, 517 F. App'x 647, 650 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted) ("Although [defendant] was handcuffed and under arrest when he consented to the search, these circumstances alone do not mandate a finding of involuntariness."); see also United States v. Witten, 649 F. App'x 880, 887 (11th Cir. 2016) (per curiam) (unpublished) (citation omitted) (noting a previous holding that "a defendant's consent [was] voluntary even where such consent was given after officers had already arrested and handcuffed the defendant); United States v. Williams, 199 F. App'x 828, 832 (11th Cir. 2006) (per curiam) (unpublished) (finding consent to search voluntary, despite the fact that defendant signed the consent form while handcuffed in the back of a police car).  "Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that [Mrs. Brito-Arroyo] freely and voluntarily consented to a search of the [apartment]."

Rodriguez-Alejandro, 664 F. Supp. 2d at 1338 (citations omitted); see also Brown, 223

F. App'x at 880 (finding consent to search voluntary despite the fact that officer had

drawn his weapon and placed defendant in handcuffs); Hidalgo, 7 F.3d at 1567, 1571

(finding consent voluntary where defendant was arrested by law enforcement who

had broken into his home early in the morning, woke him up, and forced him to the

ground at gun point); Garcia, 890 F.2d at 361 (holding consent voluntary where

defendant was arrested by numerous officers, was patted down for weapons, was

handcuffed, and where the officers refused to accept defendant's conditional consent

to search and threatened to obtain a search warrant if he did not consent to a full

search).[37] Accordingly, the Court finds that Mrs. Brito-Arroyo voluntarily consented

to the search of the apartment, and it is **RECOMMENDED** that Brito-Arroyo's

---

[37] Brito-Arroyo claims that his wife's consent was fabricated because the
English translation of the consent form indicates that she purportedly signed the
form at 4:15, which was prior to the traffic stop. [Doc. 130 at 22]. However, the
government argues that while the English translation of the consent form states it
was signed at 4:15, the Spanish form reflects 9:15 "in poor handwriting." [Doc. 133
at 40]. Brito-Arroyo has not responded to this argument. While it is not clear
whether Mrs. Brito-Arroyo wrote 4:15 or 9:15, see (Tr. 2, Gov't Ex. 7), this does not
convince the undersigned that the consent form was fabricated, and Brito-Arroyo
has not pointed to any other evidence of fabrication. TFO Petron testified that he
was the first to arrive at the apartment that evening, that TFO Alvarez arrived a little
bit later with Mrs. Brito-Arroyo, and that he presented the consent-to-search form
in Spanish to her, gave her time to read it, and that she then signed it in his presence.
(Tr. 2 at 205-08). The Court finds TFO Petron's testimony to be credible. See United
States v. Young, No. 1:12-cr-45, 2012 WL 3762506, at *2 (E.D. Tenn. Aug. 7, 2012),
adopted by 2012 WL 3762486, at *1 (E.D. Tenn. Aug. 28, 2012) (finding testimony of
officers credible despite defendant's claims of fabrication and subsequent additions
to the consent form).

motion to suppress evidence arising from the search of the apartment, [Doc. 77], be **DENIED**.

**C.     Motion for Disclosure of Confidential Informant, [Doc. 117]**

Prior to the second evidentiary hearing, Brito-Arroyo moved the Court "to compel the government to disclose to the defense the name and location of the informant and to grant [him] access to the informant." [Doc. 117 at 5]. Brito-Arroyo argued that "disclosure of the informant's identity and location [was] important to [his] ability to provide all relevant evidence at the hearing and to test the veracity of the affiant and other officers who have already, undisputedly, presented false testimony to a Georgia Superior Court Judge." [Id.]. The Court held a telephone conference on August 15, 2018, and after hearing argument from counsel, found no basis for granting Brito-Arroyo's motion prior to the hearing, but took the motion under advisement pending the testimony presented at the evidentiary hearing. See [Doc. 118]; see also (Tr. 2 at 16). The testimony at the hearing established that a confidential informant supplied information about the Jeep to SA Ledgerwood that was included in the affidavit to establish probable cause for the tracker warrant, which is uncontested, but this information did not contribute to the miscommunication between SA Ledgerwood and TFO Angel that led to the inclusion of the incorrect information about the Jeep being connected to Coweta County that was the subject of the second evidentiary hearing. Thus, nothing presented at the evidentiary hearing changed the Court's tentative conclusion reached during the telephone conference that Brito-Arroyo failed to establish the

relevancy and potential helpfulness of the informer's testimony by way of a sufficiently specific demonstration to require disclosure under <u>Roviaro v. United States</u>, 353 U.S. 53 (1957), and Brito-Arroyo did not renew his motion at the evidentiary hearing or further perfect it thereafter, <u>see</u> <u>Rugendorf v. United States</u>, 376 U.S. 528, 534-35 (1964); <u>United States v. Ayala</u>, 643 F.2d 244, 247 (5th Cir. 1981). Accordingly, his motion for disclosure of the name and location of the confidential informant, [Doc. 117], is **DENIED**.

### III.   CONCLUSION

For the foregoing reasons and cited authority, Brito-Arroyo's motion for disclosure of confidential informants, [Doc. 117], is **DENIED**, and it is **RECOMMENDED** that Arroyo-Garcia's motions to dismiss or alternatively to sever, [Docs. 59 & 83], Brito-Maldonado's motion to suppress evidence obtained from the search of his residence, [Doc. 64], and Brito-Arroyo's motions to suppress evidence from the tracker device and various searches, [Docs. 77 & 114], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 2nd day of March, 2019.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE